JAMES A. DILLON, Plaintiff-Appellee, v. U. S. STEEL CORPORATION, n/k/a USX Corporation, Defendant-Appellant and Third–Party Plaintiff-Appellant (Edward Gray Corporation, Third–Party Defendant-Appellee).

First District (2nd Division)   No. 86—2490

Opinion filed August 4, 1987.

188

Gessler, Wexler, Flynn, Laswell & Fleischmann, Ltd., of Chicago

(George W. Gessler, Donna Kaner Socol, and Kimberly Marsh, of counsel), for appellant.

O'Connor & Schiff, of Chicago (Elliot R. Schiff and Denis O'Malley, of counsel), for appellee Edward Gray Corporation.

Lawrence L. Kotin, Ltd., of Chicago (Lawrence L. Kotin, Pamela Lynn Colon, and Michael W. Rathsack, of counsel), for appellee James A. Dillon.

JUSTICE STAMOS delivered the opinion of the court:

Defendant appeals from the order of the circuit court entering judgment in the amount of $2,109,000 on the verdict of the jury which found in favor of plaintiff James Dillon. The jury also returned a verdict in favor of third-party defendant and against defendant. On appeal now, defendant contends: (1) that plaintiff failed to prove as a matter of law that defendant was negligent; (2) that the trial court improperly admitted evidence of defendant's post-accident remedial measures; (3) that the trial court erred in barring testimony regarding plaintiff's training, experience and competence; (4) that the trial court erred in refusing to tender defendant's special interrogatory and certain instructions to the jury; and (5) that the damage award was excessive.

The record indicates that on June 19, 1979, plaintiff, an employee of Edward Gray Corporation, third–party defendant-appellee, was severely injured while performing his duties as a lancer at defendant's plant in Gary, Indiana, when a quantity of molten metal erupted from a lump of scrap steel and struck him. The scrap metal, known as a strawberry, erupted as he attempted to cut the strawberry into smaller pieces for recycling.

Prior to trial, several evidentiary matters were ruled upon. The court sustained plaintiff's motion *in limine* to bar testimony regarding plaintiff's job performance during his training period prior to the incident on the grounds that it was irrelevant. Defendant's motions to bar evidence of its post-occurrence remedial measures and to exclude the investigatory committee's report were taken under advisement. Defendant's investigatory committee had issued a report following the accident containing the following recommendations:

> 1. All burners should wear aluminized coats when burning lumps.
>
> 2. No "E" lump will be burned until 24 hours after the lump has been dumped out of the ladle.
>
> 3. Investigate the possibility of using a burning shield either portable or stationary.

The court ruled later that reference to two of the committee's recommendations regarding a shield and safety clothing were barred and permitted only the reference to the 24-hour cooling period.

Bernard Jajowka, a former supervisor of the Basic Oxygen Process (BOP) shop at defendant's plant, testified that during the steelmaking process, after molten steel is poured into molds, excess steel is transferred to an emergency or "E" ladle. A strawberry is formed when leftover steel solidifies in the "E" ladle, then is transferred by a crane to a stand and then to the ground in the slag yard. The strawberry is cooled in the ladle for approximately eight hours and weighs from 10 to 40 tons. The ladles used for this process were made by defendant. Strawberries are quartered and carried back to the vessels where they are remelted.

On the day of the incident, plaintiff and another lancer, Charles "Cedar" Thompson, reported to Jajowka at 8 a.m. Jajowka told them that there were strawberries to be cut. Jajowka stated that defendant kept no records regarding when a strawberry was dumped from the ladle and placed in the yard. Later that morning, Jajowka received orders from his superintendent, Mr. Besich, to lance a small wedge from a particular strawberry and to send the sample to the laboratory for analysis; analysis was sought on this lump because it was "warmer." Jajowka stated that the laboratory had never asked for such a sample from a strawberry before. He added, "nobody ever knows or ever determined whether it [a strawberry] completely solidifies." Jajowka did not know whether defendant's metallurgical laboratory had ever conducted tests to determine when the inside of a strawberry was molten. Jajowka had never known of an incident such as a burst of molten steel spewing from a strawberry occurring before.

Plaintiff's accident occurred at approximately 2:30 p.m. Later that afternoon, Jajowka met as part of the investigatory committee to discuss the accident. At the scene, the committee observed that molten steel had spewed approximately 75 to 100 feet across a roadway and covered a cinder block building with a fine mist. The committee thereafter recommended that as a precautionary measure, in the future, defendant would wait 24 hours after a strawberry was dumped to lance it. The committee never made a determination as to what caused the incident. Jajowka testified that the committee made two additional recommendations, but was not permitted to testify as to these recommendations.

On cross-examination, Jajowka testified that he had never lanced a strawberry in which there was a liquid center. Jajowka stated that the decision to cut a strawberry is that of the lancer. The process of melt-

ing the steel, pouring it into molds and removing the excess steel from the "E" ladle is supervised by defendant's employees. Defendant's employees also monitor the temperature of the molten steel and can approximate the amount of excess steel which will be poured into a ladle. Jajowka explained that a warm strawberry was easier and faster to cut.

At the close of Jajowka's testimony, outside the presence of the jury, plaintiff's attorney objected to defendant's attorney's questioning of Jajowka regarding the fact that there were two additional recommendations made by the investigatory committee. Plaintiff's attorney maintained that such questioning prejudiced plaintiff because it inferred to the jury that plaintiff was withholding information. Plaintiff's attorney further argued that such questioning opened the door to the entire investigatory report, in violation of the court motion *in limine* which excluded evidence of post-occurrence remedial measures. The court denied plaintiff's counsel's request to instruct the jury to disregard the testimony regarding additional recommendations and reserved his ruling on the admissibility of the entire investigatory report for a later date.

Charles Thompson testified that he had been employed as a lancer by third-party defendant at the time of plaintiff's accident and had been so employed for approximately 25 years. Lancing is usually performed with an oxygen lance, a pipe approximately one-half inch in diameter and 20 feet long. The end of the pipe is lit and placed against the strawberry. A lancer would not know whether the strawberry was solid or molten inside. During the lancing process, small bean-sized pieces of steel spew from the strawberry and for this reason, flame-resistant clothing is worn. Ultimately, the strawberry is cut in half. A warm strawberry can be cut in eight hours and may require up to 75 pipes.

On the morning of plaintiff's accident, Thompson was asked to excise a portion of the strawberry which later erupted. Lancers typically wear a flame-retardant green suit, leather leggings, gloves, safety glasses, a face mask and a shield. Thompson and plaintiff were assigned to work as partners and Thompson was to train plaintiff, a less experienced lancer. After Thompson excised a biopsy from the strawberry, they were told by their supervisor, Jajowka, to lance the "hot" strawberry because Jajowka wanted to clear the area for three or four other strawberries due in that evening. He stated that there was no way to know whether the core of the strawberry was molten. Thompson lanced the strawberry for approximately 45 minutes and was then relieved by plaintiff.

Thompson testified that plaintiff did so properly and in the manner taught to him by Thompson and stated that plaintiff lanced "as good as I [Thompson] can do it." Immediately before the accident, a van came down the roadway adjoining the slag yard. Thompson saw plaintiff turn the valve down on his pipe and Thompson began to move a barrel from the roadway when he saw a bright flash of light and heat and then a spray of molten steel spew from the strawberry. Thompson fled from the area and ran to the office to report the incident and to send for an ambulance. Thompson returned to the scene later and saw small pieces of steel covering the ground as well as the sides of a building across the roadway.

As a lancer for over 30 years, Thompson had never seen such an explosion. Thompson had lanced strawberries in which there were molten centers, once or twice, but had never had problems with them, as the molten metal merely ran onto the ground. The decision to burn a particular strawberry was usually that of the lancer, unless he received orders to do otherwise.

An offer of proof was made by defendant. Outside the presence of the jury, Thompson testified that he had worked with plaintiff on two earlier occasions during which plaintiff had had difficulty taking instructions. Thompson told his supervisor that plaintiff was not an experienced lancer and threatened to leave if plaintiff were not removed from lancing work. Plaintiff was fired but returned nine days prior to the accident and asked to work again. Thereafter, plaintiff's attitude changed and he appeared willing to learn and in fact learned well.

J. C. Hodges, an employee of the third-party defendant, testified that he witnessed plaintiff's accident as he arrived at work at 2:15 p.m. on June 19 in a van driven by a co-worker Larry Robinette. The van had stopped approximately 60 feet from plaintiff, who was lancing a strawberry, when the strawberry erupted.

Hodges described the eruption as similar to that of a volcano. Some of the molten metal hit the van's windshield and a building nearby. Plaintiff turned and began to flee, then dropped to the ground. When the metal stopped erupting, Hodges exited the van and ran to help plaintiff. Plaintiff's mask and hard hat had been blown from his head. Plaintiff was conscious. Hodges and several co-workers tried to calm plaintiff and poured several gallons of water on his head and body. Plaintiff's body was smoking and he began to tear clothes from his body. Hodges saw blisters begin to form on plaintiff's arms. An ambulance arrived immediately and took plaintiff away.

William Faison, Jr., a former supervisor of safety at defendant's plant, testified that he arrived at the scene of plaintiff's accident ap-

proximately one-half hour after its occurrence. Faison observed steel residue on the ground. After an investigatory committee met, a report was prepared. Plaintiff's attorneys attempted to introduce a copy of this report into evidence but a sidebar was called. After discussion, the report was admitted into evidence after deletion of the report's references to two of the recommendations made by the committee. Hodges then testified regarding the committee's determination that the core of the strawberry was molten and its recommendation that there be a 24-hour cooling period before a strawberry is lanced. Plaintiff's counsel attempted to question the witness further regarding why the committee's recommendation was made, but defendant's attorney objected and argued during a sidebar that this line of questioning about defendant's post-occurrence recommendations was improper. The court overruled the objection. Hodges stated the safety of the third-party defendant's workers was not within the purview of his work but was the responsibility of the third-party defendant.

Sol Lieberman, former risk manager for the third-party defendant, testified that he learned of plaintiff's accident shortly after its occurrence and attended the meeting of the investigatory committee later that afternoon. Lieberman observed a path of hot metal on the ground approximately several hundred feet in length. Lieberman recalled that the committee advised that all strawberries cool for 24 hours before they are lanced. Lieberman had no opinion as to the cause of the accident. Lieberman stated he had worked for the third-party defendant for approximately 30 years and had never known of the occurrence of a similar accident.

Larry Robinette testified that at the time of plaintiff's accident, he was employed by the third-party defendant and worked at defendant's plant. Robinette witnessed plaintiff's accident at approximately 2:30 p.m. that afternoon as he arrived at work in his van with J. C. Hodges. Robinette saw plaintiff lancing near the roadway and, as was customary, stopped approximately 30 feet away and tooted his horn. As plaintiff turned to Robinette and nodded, the strawberry which he was lancing erupted and spewed flames, sparks, and slag everywhere. Small pieces of slag burned into Robinette's windshield. Plaintiff appeared to be on fire. Several co-workers quickly doused plaintiff with water and an ambulance arrived within five minutes.

Joseph Besich, former supervisor of the BOP shop at defendant's plant, testified next. Prior to his testimony, the court instructed him that questioning at trial would only involve what he found as a result of his investigation on the date of the accident and would not involve how his opinion may have changed. Besich stated that one of his responsibil-

ities was to see to the safety of employees and to protect them from the dangers of molten steel. Besich called the meeting of the investigatory committee shortly after plaintiff's accident. The committee concluded that the core of the strawberry was molten and recommended that in the future strawberries should cool for 24 hours before they are cut, as a strawberry which cools longer will become harder.

While Besich was primarily concerned with the safety of defendant's employees, he interacted on occasion with third-party defendant's safety personnel.

Thereafter, Besich testified outside the presence of the jury that a lump of the strawberry which erupted was analyzed by defendant's metallurgical laboratory. He stated that defendant had the capabilities to determine how quickly a particular strawberry would have cooled.

Anthony Ianello, senior vice-president for third-party defendant, testified that a booklet on safety policy and procedures was issued by them and given to their employees. In addition, copies of the booklet were available in the employees' locker room. Defendant also had prepared an identical booklet which it distributed at the front gate.

Plaintiff testified that he had been employed by third-party defendant as a lancer for approximately three months prior to the accident. On the day of the incident, he was assigned to work with Thompson, a senior lancer. They received an assignment earlier in the morning to remove a sample from the strawberry which later erupted. Later that afternoon, they were interrupted from their work on a cool strawberry and instructed to lance the "hot" strawberry. Plaintiff had been lancing for approximately 45 minutes to an hour and was approximately five feet into the strawberry when a van approached him on the roadway. Plaintiff removed his lance, and when the van remained stationary, resumed lancing. Approximately three minutes later, the strawberry exploded. Plaintiff turned and fled toward a nearby building. Several co-workers doused plaintiff with water. Plaintiff was taken to the hospital immediately.

Plaintiff remained in the hospital for 48 days. He suffered burns to his face, left ear, stomach, hands, chest, arms, back and legs. Plaintiff underwent skin grafting, debridement and hydrotherapy for his burn wounds and also medical treatment for a hearing loss to his left ear. He wore jobst garments, a stocking type garment, on his face, body, legs and hands to keep his skin flat 24 hours a day from six months to three years after the occurrence. Plaintiff later underwent a surgical procedure in which his left eardrum was rebuilt. In 1985, plaintiff was fitted with a hearing aid. Plaintiff has not been employed since the accident although he returned to third-party defendant seeking employment in

1984 and looked elsewhere seeking office work. Plaintiff stated he is extremely uncomfortable in both hot and cold environments.

Outside the presence of the jury, the parties stipulated that the medical bills incurred in plaintiff's medical treatment were $75,080.

On cross-examination, plaintiff testified that he had never performed lancing work prior to his employment with third-party defendant. He was told that during the lancing process, sparks would come back at the burner and for that reason protective clothing was worn. Plaintiff was never given a safety manual and was not told of any safety procedures. Plaintiff was taught the proper method of lancing as well as safety precautions by Thompson. All hoses, lances and oxygen are provided by defendant.

The evidence deposition of Dr. Martin Robson, a specialist in plastic surgery, was then read into evidence. Dr. Robson testified that he first saw plaintiff when he was admitted to the emergency room at the University of Chicago hospital on June 19, 1979. Plaintiff suffered burns on approximately 50% of his body. Plaintiff was treated with debridement and given intravenous fluids and narcotics. Plaintiff later underwent hydrotherapy, surgical debridement and skin grafts to his shoulder and ear. He was placed in static splints to keep his joints extended. Plaintiff complained of hearing loss in August 1979 and was referred to an otolaryngologist. He experienced nerve compression in his wrist known as carpal tunnel syndrome and contractures in the tissue under his arm. Additional skin grafting or lengthening the scar was suggested. Dr. Robson described plaintiff's recovery as good.

Dr. David Harris, a general surgeon, also testified by deposition that he first examined plaintiff on July 17 for complaints of abdominal pain. X rays showed plaintiff's gallbladder to be nonfunctional. Dr. Harris stated that such gallbladder diseases have been noted in instances where the patient is under great stress. Dr. Harris also observed contracture over the left axillary line under plaintiff's arm and a perforated ear canal. Dr. Harris performed surgery the following day and removed several gallstones.

Dr. David Fisher, a plastic surgeon, testified that he first examined plaintiff in November 1984. Dr. Fisher noted burns on approximately 55% of plaintiff's body. Plaintiff suffered from a scar contracture in the skin of his neck, shoulder and chest which prevented him from raising his arm above his head. A skin graft was recommended to afford plaintiff greater mobility. Dr. Fisher also noted that plaintiff's sweat glands had been burned, causing daily hot flashes and the danger of trauma. Dr. Fisher also recommended plastic surgery to remove plaintiff's outer ear. Dr. Fisher opined that plaintiff's disfigurement and its side

effects were permanent. He further opined that plaintiff would be best suited for clerical work in an air-conditioned office where he would be allowed to sit.

Dr. James Raj, a specialist in ear surgery, testified by deposition that he first examined plaintiff in July 1982. Plaintiff complained of a hearing loss in his left ear and told Dr. Raj he had undergone surgery two years previously to replace his eardrum. Dr. Raj conducted hearing tests which showed that plaintiff suffered from a moderate hearing loss. Plaintiff was treated over the next several months for ear infections and underwent surgery in December 1982 for further reconstruction of the eardrum. Plaintiff showed slight post-operative improvement.

Dr. Joseph Touma, an ear specialist, testified by deposition that he examined plaintiff in July 1983 at the suggestion of Dr. Raj. Dr. Touma observed multiple perforations of plaintiff's left eardrum, which he opined were secondary to a burn injury. In October 1983, Dr. Touma performed a second tympanoplasty, repeating the process used in plaintiff's earlier surgery by Dr. Raj, to rebuild plaintiff's eardrum. The results were beneficial, although scarring affected plaintiff's hearing and some permanent loss of hearing occurred.

During the instructions conference, defendant tendered the following interrogatory to the court:

"Prior to the Plaintiff's accident, was it reasonably foreseeable that an eruption of molten steel would come from the mass of steel that the plaintiff was cutting at the time of the accident?"

The court refused this interrogatory, opining that the jury was adequately informed with respect to the issues of this case with the selected instructions. The court also refused defendant's instructions 2, 3 and 4:

"2. You can find the defendant, U.S. Steel, negligent under these instructions only if the resulting mishap could reasonably have been anticipated or reasonably foreseen by the defendant.

3. Negligence, or lack of due care, can be found only if the resulting occurrence could reasonably have been anticipated or reasonably foreseen by the defendant.

4. You have heard evidence that the cause of the eruption of molten steel that burned plaintiff is not known. U.S. Steel is not obligated to explain what caused the accident to the plaintiff."

The court found that the jury was adequately instructed by the other instructions.

In his closing statement, plaintiff's counsel requested the jury award of $1,282,619 as full compensation for plaintiff's injuries. After

deliberation, the jury returned a verdict in favor of plaintiff and against defendant in the amount of $2,109,000. The jury also returned a verdict in favor of third-party defendant and against defendant.

■ Defendant's first contention on appeal is that the trial court erred in failing to grant its motion for judgment notwithstanding the verdict because plaintiff failed to prove as a matter of law that defendant was negligent. Specifically, defendant argues that the instant accident was unforeseeable and that plaintiff failed to prove that any conduct on the part of defendant proximately caused the eruption. It is settled that judgment notwithstanding the verdict is to be entered only if all the evidence viewed in a light most favorable to plaintiff so overwhelmingly favors defendant that no contrary verdict in favor of plaintiff could ever stand. (*Pedrick v. Peoria & Eastern R.R. Co.* (1967), 37 Ill. 2d 494, 229 N.E.2d 504.) We find that such standard is not met here.

■ To establish negligence on the part of defendant here, plaintiff must have proved that there was a duty owed by defendant to plaintiff, a breach of that duty and an injury proximately resulting from the breach. (*Cunis v. Brennan* (1974), 56 Ill. 2d 372, 308 N.E.2d 617.) While the foreseeability factor may be valuable in aiding the trier of fact to reach a decision on the negligence issue, the existence of a legal duty is not to be bottomed on the factor of forseeability alone; it is inadequate for a judge to use the foreseeability formula as a basis of determining the duty issue and its scope. (*Mieher v. Brown* (1973), 54 Ill. 2d 539, 301 N.E.2d 307.) Here, we find that defendant owed plaintiff a nondelegable duty to provide him with a safe place to work. *Brannon v. Southern Illinois Hospital Corp.* (1978), 69 Ill. App. 3d 1, 386N.E.2d 1126.

We also find that such duty was breached by defendant. Defendant, an expert in the production and processing of steel, had the capabilities to monitor the temperature of the molten steel. Defendant's employees supervised the molding process and could approximate the excess amount of molten steel poured into the "E" ladle. Defendant's metallurgical laboratory requested a sample of the strawberry in question earlier that day for purposes of analysis. Mr. Besich, defendant's former supervisor in the BOP shop, testified that defendant's laboratory had the capabilities to determine how quickly a particular strawberry would cool. However, defendant kept no records as to when the steel was poured, when it was dumped and how long a particular strawberry had been in the slag yard. Third-party defendant and its lancers did not have access to such information.

While lancers generally decide for themselves which strawberry

they will cut, plaintiff and Thompson were ordered by their supervisor, who was under the direction of defendant, on the day of the incident to lance the strawberry which later erupted. Mr. Besich testified that one of his responsibilities was to see to the safety of employees and to protect them from the dangers of molten steel.

Plaintiff's co-worker Thompson testified that he had lanced strawberries with a molten center in the past but in those instances, the molten steel ran onto the ground. Mr. Besich stated that a strawberry which cools longer will become hard.

■ We find that there was sufficient evidence to allow the jury to find that defendant was negligent in requiring plaintiff to lance a warm strawberry with a molten center or in failing to warn plaintiff. The record reflects defendant's failure to safeguard plaintiff from the dangers of a strawberry with a molten center. Defendant ordered plaintiff to lance the strawberry immediately, although it was still warm and most recently dumped, rather than continue with his work on a cold strawberry. Defendant did so to clear the slag yard more quickly and provide space for additional strawberries to be dumped that evening. Had defendant not insisted, plaintiff and Thompson could have continued to lance their own selection as was customary. As Besich testified, steel which has been allowed to cool will be harder, minimizing the chance that the strawberry will have a molten core and, hence, the chance that injury could be caused by this molten steel.

Defendant's safety personnel testified that defendant was aware of the dangers of molten steel. By ordering plaintiff to lance a hot strawberry, defendant knew or should have known that the dangers of injury from molten steel were increased. While defendant may not have foreseen the exact harm that would arise from its procedures, the jury could conclude from the evidence that where plaintiff was required by defendant to blow high pressure oxygen into a lump of hot steel, containing a molten core, an injury to plaintiff was foreseeable and proximately caused by defendant's conduct. Thus, we find that the trial court did not err in failing to grant defendant's motion for judgment notwithstanding the verdict.

■ Defendant's second contention on appeal is that the trial court improperly admitted evidence of defendant's post-accident remedial measures.

The established rule in Illinois is that post-occurrence changes are not admissible to prove negligence on a defendant's part. (*Salvi v. Montgomery Ward & Co.* (1986), 140 Ill. App. 3d 896, 489 N.E.2d 394; *Lundy v. Whiting Corp.* (1981), 93 Ill. App. 3d 244, 417 N.E.2d 154.) The rationale for this rule is twofold: correction of unsafe conditions

should not be deterred by the possibility that such an act will constitute an admission of negligence, and more fundamentally, a post-occurrence change is insufficiently probative of prior negligence, because later carefulness does not imply prior neglect. *Salvi v. Montgomery Ward & Co.* (1986), 140 Ill. App. 3d 896, 489 N.E.2d 394; *Lundy v. Whiting Corp.* (1981), 93 Ill. App. 3d 244, 417 N.E.2d 154.

■ While the rule in Illinois is that post-occurrence remedial measures are inadmissible to prove want of care at the time of the occurrence, many exceptions have been carved out. (*American State Bank v. County of Woodford* (1977), 55 Ill. App. 3d 123, 371 N.E.2d 232.) Although evidence of subsequent repairs is inadmissible to show prior negligence, it is admissible to show who controlled the instrumentality when control is in issue. (*Kuhn v. General Parking Corp.* (1981), 98 Ill. App. 3d 570, 424 N.E.2d 941; *Coshenet v. Holub* (1980), 80 Ill. App. 3d 430, 399 N.E.2d 1022; *Christianson v. City of Chicago Heights* (1968), 103 Ill. App. 2d 315, 243 N.E.2d 677.) In a proper case, a court may admit evidence for the purpose of showing control under a limiting instruction which warns the jury not to consider the evidence for the purpose of the issue of negligence. *Seipp v. Chicago Transit Authority* (1973), 12 Ill. App. 3d 852, 299 N.E.2d 330.

In the instant case, prior to trial, the court granted defendant's motion *in limine*, limiting the parties' reference to certain recommendations by defendant's investigatory committee immediately after the accident. The court barred references to two recommendations but allowed references of the third recommendation, *i.e.,* that strawberries should be cooled for 24 hours prior to being lanced, to be made. Later, when the report itself was entered into evidence, the excluded recommendations were deleted. Thus, only defendant's investigatory committee's recommendation of a 24-hour cooling period was given to the jury.

■ Here, evidence of defendant's investigatory committee recommendation was properly admitted to show who controlled the instrumentalities which caused plaintiff's injury. Rather than showing negligence on the part of defendant, evidence of this recommendation was presented to show that defendant was in the control of the premises and had control and authority over the entire steelmaking process at its plant, including the pouring of molten steel, the transfer of excess steel to the slag yard and the decision regarding whether to cut a strawberry immediately or to allow the strawberry to cool further. Accordingly, the admission of this recommendation was not in error.

Moreover, no evidence was presented as to whether the recommendation was adopted or enforced by defendant thereafter. No evidence was adduced as to any remedial conduct by defendant. In its discussion

of whether to admit evidence of this recommendation at trial, the court noted that a recommendation was "obviously different from what changes were made."

Defendant's argument that evidence of this recommendation was the cornerstone of plaintiff's case and was impermissibly used as evidence of defendant's negligence is without merit. The gist of the recommendation is that a longer cooling period would have been feasible and would have prevented the core of the strawberry from remaining molten. Mr. Besich, defendant's former BOP shop supervisor, testified that a strawberry which cools longer will become harder. Thus, evidence of this recommendation did not provide the jury with any more information than they received from Besich's trial testimony, or in essence, from their own common sense.

It is also noted that the jury was specifically instructed at defendant's request that this recommendation was not be considered evidence of negligence. While defendant sought to have the jury instructed at the time the recommendation was admitted into evidence as to the purpose for which it was being introduced, defendant cites no authority in support of this contention. Thus, we find that no reversible error was committed by the trial court in admitting evidence of the investigatory committee's recommendation to provide a 24-hour cooling period.

Defendant's third contention on appeal is that the trial court erred in barring testimony regarding plaintiff's training, experience and competence on the grounds of relevancy. It is settled that evidence is considered relevant if it has a tendency to prove a fact in controversy or render a matter in issue more or less probable. (*Dayan v. McDonald's Corp.* (1984), 125 Ill. App. 3d 972, 466 N.E.2d 958; *Mueller v. Yellow Cab Co.* (1982), 110 Ill. App. 3d 504, 442 N.E.2d 595.) We find that the trial court's decision to bar such evidence was not in error.

Generally, evidence of conduct of a person on another occasion or occasions is irrelevant on the question of his conduct on the occasion in issue, except to show habit, state of mind, knowledge or intent. (*Herget National Bank of Pekin v. Johnson* (1974), 21 Ill. App. 3d 1024, 316 N.E.2d 191.) Evidence of other specific, though similar, acts may not be proved simply to show that, having done the same thing before, the person is likely to have done it on the occasion in issue. *Herget National Bank of Pekin v. Johnson* (1974), 21 Ill. App. 3d 1024, 316 N.E.2d 191.

Here, defendant made an offer of proof in an attempt to introduce evidence of plaintiff's lack of competence during his initial training period as a lancer. Defendant apparently sought to show that plaintiff had had difficulty when he first began his training with respect to

concentration and taking instruction and was ultimately fired. As the evidence further indicated, however, plaintiff returned to the job with a changed attitude, appeared willing to learn and in fact learned well. On the day of the incident, senior lancer Thompson testified that plaintiff was lancing properly and in the manner Thompson had taught him. Thompson added that plaintiff lanced "as good as I can do it." There was no evidence which would indicate that plaintiff did not know what he was doing at the time of the accident. Thus, exclusion of evidence regarding plaintiff's prior competence and training was not in error.

■■ Defendant's fourth contention is that the trial court erred in refusing to tender defendant's special interrogatory and instructions 2, 3, and 4 to the jury.

It is noted initially that no copy of defendant's special interrogatory appears in the record. In its post-trial motion, defendant argues that the court erred in failing to give the interrogatory, yet the memorandum of law filed by defendant in support of its motion fails to mention the interrogatory and no copy of the allegedly proposed interrogatory is attached thereto. The only mention of the contents of this interrogatory occurs when defense counsel read this interrogatory aloud to the court during the instruction conference, but the record does not make it clear that this interrogatory was actually presented to the court. Accordingly, defendant has failed to properly preserve this argument for purposes of appeal.

■■ Defendant similarly failed to make sufficient mention of its refused instructions in its post-trial motion. Defendant perfunctorily states therein that the trial court erred in failing to give these instructions, yet advances no argument as to why such refusal was error in its accompanying memorandum of law. Pursuant to *Brown v. Decatur Memorial Hospital* (1980), 83 Ill. 2d 344, 415 N.E.2d 337, we find that defendant's post-trial motion was not sufficient to preserve the instructions issue.

■■ Moreover, the trial court found that such instructions were unnecessary as the jury was adequately instructed by the approved instructions. The three instructions, non-Illinois Pattern Jury Instructions (IPI), were properly refused because the issues were adequately covered by IPI instructions. (107 Ill. 2d R. 239(a)).) If such non-IPI instructions were to be used, they must be simple, brief, impartial and free from argument. (107 Ill. 2d R. 239(a).) Here, the refused instructions include such words as "mishap" and "accident," which improperly characterize the incident as one where no one is accountable. Instructions 2 and 3 refer to foreseeability, in spite of the fact that Illinois law does not require that the specific incident have been foreseeable by

defendant, and thus are incorrect statements of the law. Thus, we find that the trial court did not err in refusing defendant's tendered non-IPI instructions.

▮▮▮▮▮ Defendant's final contention on appeal is that the damage award was excessive. The question of damages is one of fact for the jury and ordinarily the court will not substitute its judgment for that of the jury. (*Mathieu v. Venture Stores, Inc.* (1986), 144 Ill. App. 3d 783, 494 N.E.2d 806; *Lapidus v. Hahn* (1983), 115 Ill. App. 3d 795, 450 N.E.2d 824.) Among the factors to be considered are the permanency and extent of injury, possible future deterioration, medical expenses, and restrictions on daily activity because of the injury. (*Mathieu v. Venture Stores, Inc.* (1986), 144 Ill. App. 3d 783, 494 N.E.2d 806; *Simmons v. Union Electric Co.* (1984), 121 Ill. App. 3d 743, 460 N.E.2d 28.) The test for an excessive verdict is whether it falls within the necessarily flexible limits of fair and reasonable compensation or is so large as to shock the conscience.

In *Mathieu v. Venture Stores, Inc.*, where plaintiff was injured at a construction site when he was forced to jump from a ladder and suffered from a shattered heel bone, defendant contended that the jury award of $450,000 was excessive. This court noted that while plaintiff sustained medical expenses of $26,000, additional costs of $13,000 were anticipated and plaintiff continued to suffer from restricted mobility and chronic pain resulting from degenerative arthritis. We found that the jury's award was neither excessive nor the result of passion or prejudice and held that it would not be disturbed on review. In *Lapidus v. Hahn,* where plaintiff's total hospitalization expenses were only $3,695 yet the jury returned a verdict of $350,000, this court found that plaintiff's fall on defendant's icy sidewalk, resulting in a crushed elbow, caused plaintiff extreme pain and so destroyed her lifestyle that we affirmed the jury's full award.

Here, the jury's award was itemized as follows:

| | |
|---|---:|
| Disability and disfigurement | $ 750,000 |
| Past pain and suffering | 150,000 |
| Future pain and suffering | 100,000 |
| Past medical care and services | 75,000 |
| Future medical care and services | 50,000 |
| Past lost wages | 184,000 |
| Future lost wages | 800,000 |
| | $2,109,000 |

▮▮▮ Such award was clearly supported by the evidence. Plaintiff suffered severe burns over 55% of his body when molten steel

erupted onto him and caused his body to be set afire and to smoke according to witnesses at trial. Plaintiff thereafter underwent debridement and skin grafting. He underwent surgery on two occasions to rebuild his left eardrum and restore hearing; these surgeries were only partially successful. Plaintiff also underwent surgery on his gallbladder to remove several gallstones which caused him severe abdominal pain; physicians at trial opined that this ailment was a result of stress brought on by plaintiff's trauma in being severely burned. Plaintiff was required to wear jobst garments on his face, torso and limbs for periods of time ranging from six months to three years. Plaintiff also suffered from carpal tunnel syndrome, a nerve condition in his wrist which surgery was unsuccessful in correcting.

Plaintiff also experiences limited range of motion due to scar contracture of the tissue in his arms, neck and chest. Thus plaintiff cannot raise his arms above his head. Plaintiff's skin is extremely sensitive to heat and cold. In warm temperatures, plaintiff's skin does not perspire and he suffers from hot flashes.

Plaintiff's work history is that of a laborer. He can no longer meet the physical requirements of such work due to his injuries. Dr. Fisher testified at trial that plaintiff's disfigurement and its side effects were permanent. He suggested that plaintiff would be best suited for sedentary clerical work in an air-conditioned office. Plaintiff has sought clerical employment with third-party defendant, his former employer, and with several other employers but has been unsuccessful in finding work. Given plaintiff's limited skills, limited range of motion and severe disfigurement, the jury could certainly have found that he would never find suitable employment.

For the reasons set forth above, we affirm the judgment of the circuit court.

Affirmed.

SCARIANO, P.J., and HARTMAN, J., concur.