MARK LEWIS, Plaintiff-Appellee, v. COTTON BELT ROUTE—ST. LOUIS SOUTHWESTERN RAILWAY COMPANY, Defendant-Appellant.

Fifth District   No. 5—89—0798

Opinion filed June 26, 1991.—Rehearing denied August 9, 1991.

RARICK, P.J., dissenting.

John B. Gunn and Leslie G. Offergeld, both of Walker & Williams, P.C., of Belleville, for appellant.

John E. Norton, of Belleville, and Edward J. Kionka, of Carbondale, for appellee.

JUSTICE WELCH delivered the opinion of the court:

Judgment was entered against defendant, Cotton Belt Route—St. Louis Southwestern Railway Company, on May 18, 1989, by the circuit court of St. Clair County following jury verdict rendered in favor of plaintiff, Mark Lewis, in the amount of $175,000 on count I of his Federal Employers' Liability Act (45 U.S.C. §51 *et seq.* (Law. Co-op.

1981)) complaint, for injuries sustained while plaintiff was employed by defendant railroad. Defendant appeals from the circuit court's denial on October 30, 1989, of its post-trial motion relative to count I of plaintiff's complaint. Although the court also entered judgment on jury verdict in favor of plaintiff on count II of his complaint, defendant does not appeal from that portion of the court's judgment.

Defendant raises the following issues on appeal:

(1) Whether certain comments made during plaintiff's closing argument resulted in a verdict based on passion and prejudice and prevented defendant from receiving a fair trial;

(2) Whether the trial court abused its discretion by failing to impose discovery sanctions on plaintiff, allowing one of plaintiff's witnesses to refer to certain notes she had in her possession during testimony, because plaintiff failed to produce a copy of these notes to defendant during discovery;

(3) Whether the trial court erred in refusing to submit to the jury defendant's tendered instruction No. 5, Illinois Pattern Jury Instructions, Civil, No. 5.01 (2d ed. 1971) (hereinafter IPI Civil 2d No. 5.01), on failure to produce a witness within a party's power to produce;

(4) Whether the jury's award of damages for impairment of future earning capacity was proper;

(5) Whether the trial court erred in giving plaintiff's issues instruction No. 15A, which instructed the jury on plaintiff's theory of the case that defendant had negligently failed to provide plaintiff with a safe place to work;

(6) Whether the trial court abused its discretion by admitting evidence that following plaintiff's accident the railroad had placed a spotter on the job; and

(7) Whether the trial court erred in giving plaintiff's instruction No. 14, the long version of Illinois Pattern Jury Instructions, Civil, No. 15.01 (3d ed. 1991) (hereinafter IPI Civil 3d No. 15.01), on proximate cause, under the evidence presented in this case.

Plaintiff was employed by defendant on August 16, 1978, as a maintenance-of-way laborer. This job involved the maintenance and repair of tracks and included loading and unloading of rails bound for a particular railyard. The injuries involved in count I of plaintiff's complaint occurred on September 25, 1979, at defendant's East St. Louis, Illinois, yard. Plaintiff's employment with defendant was terminated in July 1984 for reasons other than his physical condition after the 1979 accident.

Plaintiff testified that on the day of the incident he and another laborer by the name of Hoover Gatewood were told to go to the west end of the track in the yard to work with Mike Flowers, the cherry picker operator, unloading bundles of railroad ties from a gondola car and putting them onto the side of the road.

A "cherry picker" is a type of crane with a telescopic boom on a turntable. Attached to the boom is a tag-line cable weighing approximately 70 pounds, the end of which is attached to ball weights, which keep tension on the cable to keep it from getting tangled. Large metal hooks weighing approximately 5 to 10 pounds are attached to these weights and attached thereto are smaller hooks, known to the railroad laborers as "tie dogs." Tie dogs are stabbed into each of the railroad ties, and when the cherry picker's boom is raised, the ends of the tie dogs dig deeper into the bundle of ties. The cherry picker had windows on all four sides and mirrors on the left side for rear view. Plaintiff testified that the cherry picker had outriggers or "feet" on the four sides which were used when lifting heavy objects since the inflated tires could not support the crane. Use of the outriggers causes the crane's wheels to be lifted off the ground. Plaintiff further testified that if the crane was to be moved, the outriggers had to be up and the wheels down.

Plaintiff testified that on the day of the incident Flowers was operating the cherry picker, and Gatewood and he were both inside the gondola car hooking tie dogs to bundles of 16 to 20 ties. He testified that the outriggers on the cherry picker were down. When the ties were hooked, they would give a signal and Flowers would raise the tie bundles and set them on the ground. After they had removed three to four bundles from the gondola car, a railroad official drove to the site and told them that they needed to move the bundles farther off the road. Flowers testified that the height of these three to four bundles of ties would not have been over 28 inches. Plaintiff moved to the ground where Flowers had placed the tie bundles and waited for Flowers to reposition the cherry picker in the spot where they would move the bundles. Plaintiff testified that Flowers had to raise the outriggers to reposition the cherry picker. He testified that he and Flowers were looking at each other as Flowers repositioned the cherry picker. At that point plaintiff had gotten on the bundles and was raising the loop and chain to hook the tie dogs onto the large hook at the end of the crane. Plaintiff then turned around so that his back was facing the crane when he was struck in the back. He fell to one knee, and as he turned around to yell at Flowers, he saw that the boom had moved a small distance down from where it had been be-

fore and was level with the position his back had been when he had been hit. Plaintiff testified that he was nowhere near the ball and large hook, which were lying against the front of the tie bundle.

Flowers testified that at the time of the accident he was looking directly at plaintiff. He testified that the distance from the ground to the crane would have been five feet with another four feet from there to where the boom was level, a total distance from ground to boom of nine feet in the boom's horizontal position. He also testified that because the boom cannot go lower than the horizontal on the crane, the boom would always be above the operator's head and never lower than his line of sight. Flowers recalled that he had lowered the cables so plaintiff could hook the tie dogs into each end of the ties and that he had let the tag line, weight, and hook down to give him enough slack. When plaintiff reached the tie dogs, Flowers let the boom down. Plaintiff hooked the ties and started to raise up when the hook caught him on one side of the back. Flowers, however, testified that the boom had not moved.

Although Gatewood couldn't remember whether plaintiff was on the ties in the gondola car or on the ground when the accident occurred, he testified that it was the boom which had struck plaintiff's back.

Gatewood testified that when the boom moves, the cab and operator move with it, and so the operator could not have a view of someone working around him all the time. Plaintiff testified that it was railroad custom to assign a crew member to act as a spotter in order to let the crane operator know where those workers were that the operator would not be able to see.

Willie Dickerson, employed by defendant railroad for 18 years and a foreman on another crew on the day plaintiff was injured, agreed with this testimony. Dickerson stated that because of the way the cab was made, it was necessary to have a spotter in situations where the boom blocks the vision of the crane operator and that this was the usual and customary practice of defendant railroad. Dickerson stated that it was up to the foreman to decide whether they should have a spotter, but he opined that a spotter is necessary to tell the operator when to move even if he can see the worker.

Flowers admitted that there were instances where you would need a spotter but testified that a spotter would not have been "feasible" at the time of plaintiff's accident because he was able to look at plaintiff through the front window of the crane's cab.

Gatewood also testified that during the afternoon of plaintiff's accident two additional men were sent to the work site and one of those men acted as a spotter.

Plaintiff testified that he got down off the bundles and told Gatewood and Flowers that he could not work any more that day. He was driven to the railroad doctor's office by a supervisor who also had him fill out an accident report form. Plaintiff told Dr. Doubek, the railroad's doctor, that he had gotten hit by the boom and had a sharp pain in his back. Dr. Doubek prescribed medication for pain, machine therapy, three days' rest, and light duty thereafter.

Plaintiff next presented himself for treatment with Dr. Robert Bolton in July 1980 because after a few months the pain had gotten worse. Plaintiff testified that he had sharp, throbbing pain in his neck, back, left arm, and leg. Dr. Bolton diagnosed cervical strain with straightening of the cervical vertebrae and scoliosis of the cervical vertebrae, thoracic vertebral strain syndrome with scoliosis, and lumbar strain syndrome with rotation of the lumbar vertebrae. Dr. Bolton prescribed muscle relaxants, medication for pain, and physical therapy. Plaintiff was also hospitalized by Dr. Bolton for 20 days that same month, during which time a myelogram was performed and plaintiff received physical therapy. Plaintiff testified that the pain decreased but never went away entirely.

Plaintiff testified he was transferred by defendant in 1982 to Kansas City, and while he was stationed there he was treated by a chiropractor. He was furloughed by defendant in 1982. Defendant called plaintiff back to employment as a laborer in 1983, but he was suspended later that year. Plaintiff testified that after he was dismissed by defendant, he applied for at least 30 jobs in the Kansas City area, and he was turned down for a number of those jobs because he had reported on the job applications that he had a prior injury to his back.

Plaintiff presented himself for treatment again with Dr. Bolton in January 1984. Dr. Bolton, who operates the St. Louis Industrial and Family Medical Center and screens prospective employees for local businesses, testified that he would leave it up to management whether or not they would want to hire an individual such as plaintiff, who had a past medical history of injury or some form of X-ray finding. Dr. Bolton testified that although plaintiff's neurological exam was normal at that time, plaintiff would continue to have tenderness in the cervical area and muscle spasm, and he opined that plaintiff would continue to have pain and need treatment in the future and would be limited in the types of sports he had previously engaged in and work he could do. Dr. Bolton explained that soft tissue injuries heal with

scar tissue, which is permanent but which will not show up in an X ray. This was the last medical treatment plaintiff had received prior to the trial because, plaintiff testified, he could not pay the doctor bills and the railroad refused to pay them. Plaintiff admitted, however, that he could be treated at a Veterans' Administration hospital. Plaintiff's total medical expenses for the back injury were $10,034.44.

After his discharge from employment with defendant in 1984, plaintiff and his wife moved to California, but he did not report the back injury in his job search there. He worked for three to four months at a wood shop and for one day working construction. He testified that he had quit a third job at a food processing plant after seven weeks. He testified that this job did not require much heavy lifting. He testified that he had left each of these jobs because of back pain, and he was also unable to pass a physical exam for a firefighter position in Modesto, California, because of his back injury.

The last job plaintiff had in California was driving a truck for Sunrise Redi-Mix. He earned $8 per hour in this position. Plaintiff was required to undergo a preemployment physical to obtain this job. Dr. Alexis Dasig, who specializes in industrial medicine, performed the physical examination. Dr. Dasig testified that according to the evaluation, plaintiff could lift 100 pounds from the horizontal a distance of 18 inches and from the vertical a distance of 36 inches, using 44.6% of his body strength. Dr. Dasig testified this was a normal finding. Plaintiff was able to lift 60 pounds from floor to waist five times without pain. He was able to lift 60 pounds and carry it 50 feet without pain. He was able to hold 15 pounds with arms outstretched for 15 seconds without pain and drag 100 pounds for 10 feet then lift the weight to waist height without pain. Range-of-motion testing on the lower back was within normal limits, as was hip extension and flexion, straight-leg raising, and reflex testing on the lower extremities. An examination of plaintiff's back and spine was also normal, and Dr. Dasig recommended plaintiff for the truck-driving position. Plaintiff reported no prior back injury during his examination.

Plaintiff left his job with Sunrise Redi-Mix to move with his wife to New Mexico, where his wife's sister lived. Plaintiff is presently working for the State of New Mexico as a prison guard. He was required to pass a physical exam when he obtained this job. He receives $8 per hour in his position as a prison guard. The last pay scale plaintiff received while working for the railroad was $12.12 per hour. Plaintiff testified that if he had not been dismissed by defendant in 1984, he could not have continued to work for defendant as a laborer because of the back injury. He could not say whether he would rather

work for defendant or in his present prison guard position. Plaintiff testified that he has had throbbing continuous pain in his lower to middle back on his right side since the accident, and he occasionally will get a sharp pain followed by numbness in his left arm and leg. Plaintiff also reported that the injury had put a strain on his marriage, making him short-tempered with his wife, decreasing their marital relations, and preventing him from being able to help with chores around the house.

Upon suggestion of plaintiff's counsel, defendant's medical expert, Dr. Rosenbaum, testified prior to the close of plaintiff's case so that he could be the first to testify in the morning of the third day of trial. Dr. Rosenbaum performed a neurological examination of plaintiff on December 7, 1987. His medical conclusion was that plaintiff's neurological examination was normal, without evidence of any disorder of the brain, spine, or central or peripheral nervous system. Dr. Rosenbaum opined that plaintiff may have initially sustained a soft tissue injury of the back which should, in the course of events, have healed. During cross-examination, he was asked whether it was true that his examination of plaintiff took nine minutes and that the medical history taken of plaintiff took 18 minutes. Dr. Rosenbaum denied each of these propositions. Plaintiff's counsel also asked Dr. Rosenbaum whether plaintiff's exhibits 102 through 118, medical reports prepared by Dr. Rosenbaum for different patients, said essentially the same as the report prepared for plaintiff's examination. Dr. Rosenbaum testified that since a neurological examination is a structured procedure, the reports should be similar, but he denied that he had a prepared format on the computer in his office so that all he had to do was plug in the history and a few other things.

Mary Schulte, a private nurse hired by plaintiff's counsel to attend the physical examination of plaintiff by Dr. Rosenbaum, testified, after Dr. Bolton's evidence deposition was read into the record, that she had accompanied clients of plaintiff's counsel to defense-expert examinations on other occasions between March 1987 and January 1988. She testified that she wrote down the time when the examination started and ended and when the history started and ended. Schulte was asked when plaintiff's examination started on December 7, 1987, and she pulled her notes from her purse. Defendant objected to the use of the notes to refresh Schulte's memory because the notes were discoverable and plaintiff had failed to produce them, in violation of a pretrial conference order requiring that both parties produce any discoverable matter which had not yet been produced.

Over defendant's objection, Schulte testified that the medical history taken by Dr. Rosenbaum took a total of 18 minutes and the examination took a total of nine minutes. She also testified that Dr. Rosenbaum did not perform some of the tests referred to in his report during his examination of plaintiff. While Schulte admitted that she would normally give plaintiff's counsel a copy of the notes she would make when she accompanied the clients on their examinations, she insisted that she had not given plaintiff's counsel a copy of the notes taken at plaintiff's examination nor had she spoken with counsel about those notes until the day of her testimony at trial. Defendant moved to strike all of Schulte's testimony concerning her observation of plaintiff's examination by Dr. Rosenbaum as a discovery sanction, but the motion to strike was denied.

During the instructions conference, defendant objected to plaintiff's tendered instructions regarding damages for future medical treatment and impairment of future earning capacity. Defendant argued that there was no basis on which the jury could award a dollar figure for future medical expenses. Plaintiff contended that Dr. Bolton's testimony that plaintiff would need future medical treatment for his back was sufficient to send the issue to the jury. The court gave plaintiff's instruction on damages for future medical treatment for count I of plaintiff's complaint. Defendant argued that there was insufficient evidence in the record to support any computation by the jury of impairment of future job capacity. The court gave plaintiff's instruction as to impairment of future earning capacity.

Defendant also objected to the inclusion in plaintiff's tendered issues instruction of the phrases, "the failure to provide a reasonably safe place to work" and "the failure to provide sufficient personnel in which to perform the work," on the grounds that these were general statements of the duty owed by defendant rather than specific allegations of how defendant was negligent. The court overruled the objection. Defendant also objected to plaintiff's tendered instruction on proximate cause, the long version of IPI Civil 3d No. 15.01, because there was no evidence of any cause for plaintiff's injury other than the railroad's alleged negligence. The court overruled the objection.

Defendant offered an instruction regarding the adverse inference to be made from plaintiff's failure to produce his wife to testify concerning the effect of plaintiff's injuries on their marital life. The court refused the instruction. Plaintiff did not offer a similar instruction with regard to defendant's failure to produce certain evidence or witnesses within its control.

During closing argument, counsel for defendant discussed the evidence in support of its defense of physical impossibility. Counsel argued that Flowers, who was the only witness to have ever operated a crane, testified that in its horizontal position the distance between the ground and the boom was nine feet with the chain, weight, and hook suspended therefrom. Counsel argued that if plaintiff, who was 76 inches in height, had been standing upright on the four tie bundles, which approximated 28 inches in height, for a total height of eight feet six inches, he would have cleared the boom, which was no less than nine feet above the ground in its horizontal position. Therefore, counsel concluded, it was physically impossible for the boom to have struck plaintiff and was more likely that when plaintiff raised up and stepped back, his back or side hit the hook suspended from the boom.

During the rebuttal section of plaintiff's closing argument, counsel made the following statement:

> "They have people *** that work on these cases within the Railroad. That is common sense. [Objection overruled.] Now, let me ask you something. Did they know about the accident in 1979? Sure they did. Did they go out and have people take statements? You heard about it here ***. [Objection overruled.] Now, since they know about the accident, they take statements. Now, where are the pictures of the cherry picker? Where are the measurements that they are trying to tell you and me that it is physically impossible, of the cherry picker? *** He says he calls the supervisor, this Mike Flowers, on custom and practice. Come on. Do you think, if that *** was a custom and practice they wouldn't have paraded a whole bunch of witnesses in here that that was the custom and practice? [Objection overruled.]"

After the jury retired to consider its verdict, defendant moved for a mistrial because of various comments made during plaintiff's closing argument. Defendant argued with regard to the failure of plaintiff to tender or the court to give an instruction on the adverse inference from failure to produce a witness or evidence within a party's control, that plaintiff knew that the cherry picker was leased equipment and therefore not under defendant's control. Defendant also argued that Tommy Johnson, supervisor in control on the day of plaintiff's accident, was unavailable for trial because he had to report to the site of a fatal train derailment in California. Defendant argued that plaintiff's counsel's comments that the jury was the "conscience of the community" and "the railroad shouldn't be able to deny this man his money," counsel's pointing out defendant railroad's manager of litigation in the courtroom, and counsel's decrying the defense tactics of

using Dr. Rosenbaum, who had been "caught" in this case because the relative findings in his examination reports for defendant railroad had been the same, were improper. Defendant also claimed that plaintiff's argument that the railroad had individuals who investigated accidents but defendant was unable to produce a photograph of the cherry picker crane was irrelevant and prejudicial and that the cumulative effect of plaintiff's rebuttal argument denied defendant a fair trial.

The court denied defendant's motion for mistrial. The jury returned with a verdict on count I in the amount of $175,000, of which $115,000 represented damages for past and future medical care and treatment. This appeal followed.

The first issue we shall address is whether the trial court abused its discretion by (1) failing to impose discovery sanctions on plaintiff, allowing Mary Schulte to refer to notes she had made when she observed a physical examination of plaintiff by Dr. Rosenbaum, defendant's medical expert, and/or (2) denying defendant's motion to strike Schulte's testimony about plaintiff's examination by Dr. Rosenbaum. Defendant contends that plaintiff violated the pretrial order concerning discovery by failing to produce a copy of notes which Schulte had made during plaintiff's examination. Defendant further contends that because of calling Dr. Rosenbaum out of order, prior to the testimony of Schulte, he was put at a disadvantage of not being able to counter Schulte's testimony during the defense's case. Plaintiff insists, however, that there was no skullduggery involved in suggesting that Dr. Rosenbaum testify out of turn prior to the close of his case and that the suggestion was made out of courtesy to the doctor. Indeed, as plaintiff points out, Schulte was intended as a rebuttal witness to impeach Dr. Rosenbaum's testimony concerning plaintiff's examination and would have, in any event, been called to testify *after* Dr. Rosenbaum.

Under Supreme Court Rule 219(c), if a party unreasonably refuses to comply with any order entered under the discovery rules the court, on motion, may enter such orders as are just, including, among others, that a witness be barred from testifying concerning that issue. (134 Ill. 2d R. 219(c)(iv).) Whether to impose sanctions against a party for noncompliance with discovery rules is within the discretion of the trial court. (*Amos v. Norfolk & Western Ry. Co.* (1989), 191 Ill. App. 3d 637, 647, 548 N.E.2d 96, 102-03.) The premise of defendant's argument is that plaintiff's counsel knew about, or was in possession or control of, Schulte's notes made during plaintiff's examination. For the court to have determined that plaintiff's counsel

was in possession of Schulte's notes prior to trial would have required that it also find that both Schulte and plaintiff's counsel were lying when they said that the notes did not come into the possession of plaintiff's counsel until the date of trial. That plaintiff's counsel indeed may have known that Schulte would take notes during plaintiff's examination is immaterial. Schulte testified that she worked as an independent contractor for plaintiff's counsel. Plaintiff's counsel would thus have had no obligation to turn over notes in the possession of someone not in his employ. Moreover, as the court discovered during the motion to strike, Schulte's name was produced in answers to interrogatories posed by defendant, defendant's counsel was aware that plaintiff's counsel sent Schulte as a matter of practice to be with his clients during the defense examination, and another attorney from defendant's counsel's office interviewed Schulte prior to trial. Therefore, defendant could have taken a deposition of Schulte and discovered that her testimony would be about the examination, including the existence of the notes which she made. We find the record devoid of any evidence that plaintiff's counsel contumaciously refused to comply with the pretrial discovery order and accordingly hold that the circuit court did not abuse its discretion in refusing to order sanctions under Rule 219(c).

Defendant next argues that the trial court abused its discretion by admitting evidence that following plaintiff's accident the railroad had placed a spotter on the job which plaintiff had been performing when he was injured. During examination of Flowers as an adverse witness, counsel for plaintiff was questioning Flowers with regard to the testimony of Willie Dickerson that it was the usual and customary practice of the railroad to provide a spotter or flagman in a situation such as the one in which plaintiff was injured. Counsel asked Flowers:

"Q. *** [W]ould it be feasible to use a flagman or spotter, as a safety precaution, for you as an operator, in a situation like this?"

At this point counsel for defendant asked to approach the bench and a conference was held, the content of which was not made a part of the record. Counsel for plaintiff then asked Flowers:

"Q. What do you mean, Mr. Flowers, when you say it would not be feasible?

A. Well, where I can see the men, and we know what job we got to do, and I can see the men directly, it is not feasible to have another man standing out there and be watching them than for me seeing the people doing the work."

Following this response, the court recessed and heard argument of counsel as to plaintiff's right to ask whether or not a spotter or flagman was placed on the job the same day after the incident in which plaintiff was injured. Defendant's counsel argued then, as he does now, that in the context of Flowers' response the witness interpreted the word "feasible" to mean "necessary under the circumstances," rather than "possible," and that post-occurrence changes cannot be shown as evidence. Counsel for plaintiff argued that this evidence could be allowed to prove ownership, feasibility of precautionary measures, or for impeachment, and he was trying to lay a foundation for impeachment since adding a spotter to the crew the very afternoon of the accident contradicted Flowers' testimony that using a spotter was not feasible. The court allowed counsel for plaintiff to ask Flowers during further adverse examination whether after plaintiff left the job on this day the railroad sent two men over to replace him, one of whom was there to be a flagman and spotter. Flowers responded that he did not recall how many men were sent or whether one acted as a spotter or flagman. Hoover Gatewood later testified that two men replaced plaintiff that afternoon, one of whom was on the ground to give the machine operator signals, to watch the two men hooking ties on the gondola car, and to unhook ties.

■ While we agree with defendant that the established rule in Illinois is that post-occurrence changes are not admissible to prove negligence on a defendant's part (*Dillon v. U.S. Steel Corp.* (1987), 159 Ill. App. 3d 186, 198, 511 N.E.2d 1349, 1358), plaintiff offered and the court allowed the evidence in order to prove feasibility of precautionary measures and impeachment. Evidence of subsequent remedial measures may not be introduced as an admission of negligence or culpable conduct but may be used for other purposes, such as proving ownership, feasibility of precautionary measures, or impeachment. M. Graham, Cleary & Graham's Handbook of Illinois Evidence §407.1, at 218 (5th ed. 1990).

There was already testimony in the case of Willie Dickerson that it was customary for the railroad to provide a spotter in a situation such as the one in which plaintiff was injured, and this testimony was disputed by Flowers, who testified that he normally did not use a spotter when moving ties from a gondola car. The court noted prior to the further adverse examination of Flowers that "feasible" means "capable of being done, executed or effected; capable of being successfully done or accomplished," citing Black's Law Dictionary 739 (4th ed. 1951). Therefore, we agree that plaintiff could have been offering the evidence not for the purpose of proving negligence, but in-

stead to impeach Flowers by showing that in the incident in which plaintiff was injured defendant was straying from its usual and customary practice; thus, provision of a spotter or flagman was "capable of being done" by defendant. In addition, placement of a spotter on the job to give more accurate information to the crane operator was relevant to impeach Flowers' testimony that his view of plaintiff was never obscured during the incident. Moreover, when Flowers stated that he did not recall whether two men were sent to replace plaintiff on the job crew and one of the men was acting as a spotter, plaintiff was within his rights to ask the same question of a later witness, Hoover Gatewood, who was on the crew that day, for purposes of further impeaching Flowers' credibility. Admissibility of evidence rests within the sound discretion of the trial court. (*Gray v. Hallett* (1988), 170 Ill. App. 3d 660, 668, 525 N.E.2d 89, 94.) Whether evidence is relevant, and thus admissible, depends on whether it tends to prove an issue in the case. (*Johanek v. Ringsby Truck Lines, Inc.* (1987), 157 Ill. App. 3d 140, 153, 509 N.E.2d 1295, 1304.) We find that the evidence was relevant and admissible and that the court therefore did not abuse its discretion in admitting this line of questioning.

Defendant has raised various objections to the jury's instructions. In reviewing each of these objections, we will apply the rule that the criterion for determining the adequacy of jury instructions is whether, taken as a whole and in series, they fairly, fully, and comprehensively apprised the jury as to the applicable legal principles. *Greenfield v. Consolidated Rail Corp.* (1986), 150 Ill. App. 3d 331, 340, 500 N.E.2d 1083, 1090.

Defendant first contends that the trial court erred in refusing to give defendant's tendered instruction No. 5, IPI Civil 2d No. 5.01, with respect to the failure of plaintiff to produce his wife to testify as to the effect of plaintiff's back injury on their life together. Moreover, defendant contends that the error in refusing to give defendant's instruction No. 5 was compounded by allowing plaintiff's counsel in final argument to comment on defendant's failure to produce pictures of the cherry picker crane and the custom-and-practice witnesses under defendant's control, when there was no instruction of the jury to be made on the adverse inference from failure to produce a witness or evidence which was in the party's power to produce.

■ IPI Civil 2d No. 5.01 instructs that where a party fails to produce a witness or offer evidence within his power to produce, the jury may infer that the testimony of the witness would be adverse to that party. As a general matter, the adverse inference is available when the missing witness was under the control of the party to be charged

and could have been produced by reasonable diligence, the witness was not equally available to the party requesting that the inference be made, a reasonably prudent person would have produced the witness if the party believed that the testimony would be favorable, and no reasonable excuse for the failure to produce the witness is shown. (*Schaffner v. Chicago & North Western Transportation Co.* (1989), 129 Ill. 2d 1, 22, 541 N.E.2d 643, 651.) The giving of this instruction rests within the sound discretion of the trial court, and a reviewing court will reverse only where a clear abuse of discretion has been shown. (*Lee v. Grand Trunk Western R.R. Co.* (1986), 143 Ill. App. 3d 500, 513, 492 N.E.2d 1364, 1374.) Before giving the instruction, however, the court must first determine that a party would in all likelihood produce the witness under the facts and circumstances unless his testimony would be unfavorable. *Lee,* 143 Ill. App. 3d at 513, 492 N.E.2d at 1374.

█ Defendant offered its instruction No. 5 because plaintiff testified about his mental situation following the injury and how all of this had affected his wife. Plaintiff's counsel noted at the hearing on the post-trial motion to vacate that he did not choose to call plaintiff's wife as a witness because he feared possible prejudice against plaintiff because he and his wife are of different races and because the couple was contemplating and, in fact, did obtain a divorce following the jury trial. Moreover, his wife was living in New Mexico and plaintiff did not want to have the transportation expense of bringing her to Illinois to testify. As plaintiff notes in his argument to this court, further testimony by plaintiff's wife would have been cumulative as to the issue of how plaintiff's back injury caused certain marital difficulties, and plaintiff's complaint did not include a claim for loss of consortium. Although plaintiff's concern of prejudice was not of record at the time the court ruled on the giving of this instruction, allegations of plaintiff's marital difficulties were of record, and so we agree that reasonable excuse for the failure to produce the witness was shown and that accordingly the trial court properly refused defendant's tendered instruction No. 5.

The same criteria govern the use of this pattern instruction and the allowance of comment in closing argument regarding the adverse inference from a party's failure to produce a witness. (*Schaffner,* 129 Ill. 2d at 22, 541 N.E.2d at 651.) The decision to permit the argument is reserved to the sound discretion of the court as well. (*Schaffner,* 129 Ill. 2d at 22, 541 N.E.2d at 651.) However, defendant argues that the trial court erred when it allowed plaintiff's argument about defendant's failure to produce photographs of the cherry picker and

witnesses about custom and usage, because closing argument must conform to the instructions which the court has indicated that it will give and the court had refused IPI Civil 2d No. 5.01. (See *Abrams v. City of Mattoon* (1986), 148 Ill. App. 3d 657, 499 N.E.2d 147.) We note that, unlike the *Abrams* case, where the court indicated that it would not give an instruction tendered by plaintiff because there was no competent evidence in the record to support such instruction and plaintiff's counsel commented on that issue in spite of the court's refusal, in the instant case it was defendant's, not plaintiff's, tendered instruction which was refused.

In the *Schaffner* case, one of the codefendants was permitted in closing argument to comment adversely that another codefendant had failed to call one of its employees as a witness, when no instruction with regard to the inference to be drawn from the failure of a party to produce a witness within its control was tendered by the first codefendant and no instruction on that subject was given by the court. On review, no abuse of discretion was found in allowing such comment on closing argument because under the criteria stated above, the court found that the witness had been hired by the party as an investigator and was therefore under the control of the party, the investigator was not a resident of this State, the investigator who investigated and photographed the accident scene would presumably have been presented if the party had believed that his testimony would have been favorable, and no good reason had been offered by the party for its failure to call its investigator as a witness. *Schaffner*, 129 Ill. 2d at 23-24, 541 N.E.2d at 652.

Defendant argues, however, that there was no proof that the photographic evidence was under defendant's control because it leased this equipment and plaintiff's counsel knew that it had good reason not to produce Tommy Johnson, the supervisor on the day of plaintiff's accident, to testify because of the train derailment in California. As plaintiff notes in his brief to this court, comments regarding absence of custom-and-usage witnesses and photographs of the cherry picker crane were made by counsel during his rebuttal to defendant's closing argument, in response to the exposition of a theory that it was physically impossible for the crane at its lowest horizontal boom extension to have struck plaintiff in the back, as plaintiff and his witnesses had testified. Therefore, plaintiff argues, the comments were reasonable and fair and did not interfere with defendant's right to a fair trial.

■ The scope of closing argument is within the sound discretion of the trial court, and an argument must be prejudicial for a review-

ing court to reverse on these grounds. (*Lee v. Grand Trunk Western R.R. Co.* (1986), 143 Ill. App. 3d 500, 519, 492 N.E.2d 1364, 1379.) Moreover, attorneys are allowed broad latitude in drawing reasonable inferences and conclusions from the evidence. (*Tonarelli v. Gibbons* (1984), 121 Ill. App. 3d 1042, 1049, 460 N.E.2d 464, 469.) We find that the court reasonably could have concluded that plaintiff was not commenting upon defendant's failure to call a witness or produce certain evidence within its control but was instead comparing or contrasting the evidence or commenting upon disparities and gaps in the testimony presented on the physical impossibility theory. (See *Chavez v. Watts* (1987), 161 Ill. App. 3d 664, 669, 515 N.E.2d 146, 150; *Gilman v. Kessler* (1989), 192 Ill. App. 3d 630, 647, 548 N.E.2d 1371, 1382.) We therefore find no abuse of discretion in allowing these comments made by plaintiff's counsel during the rebuttal section of his closing argument.

We will next examine whether the trial court erred in giving plaintiff's issues instruction No. 15A, which instructed the jury on plaintiff's theory of the case that defendant had negligently failed to provide plaintiff with a safe place to work and sufficient personnel to conduct his work. Defendant contends that this instruction was improper because it submitted general rather than specific allegations of negligence and an allegation of negligence which could not have been a proximate cause of plaintiff's accident. Plaintiff's instruction No. 15A provided, in pertinent part, as follows:

"That in Count I (September 25, 1979) the plaintiff claims that he was injured and sustained damage, and that the defendant was negligent in one or more of the following respects:

1. It failed to provide the plaintiff with a reasonably safe place to work;

2. It failed to provide sufficient personnel for the plaintiff to conduct his work in a reasonably safe manner;

3. The defendant, through its agents, negligently struck the plaintiff with their cherry picker ***."

As to the first alleged impropriety, defendant contends that the instruction permitted the jury to believe, by its general allegations of negligence, that the mere happening of an accident to a railroad employee constitutes negligence. Defendant is correct in noting that the Federal Employers' Liability Act (Federal Act) imposes liability only for negligent acts. (*Milom v. New York Central R.R. Co.* (7th Cir. 1957), 248 F.2d 52, 55.) The Federal Act makes a common carrier engaged in interstate commerce "liable in damages to any person suffering injury while he is employed by such carrier in such commerce ***

resulting in whole or in part from the negligence of any of the officers, agents or employees of such carrier." (45 U.S.C.S. §51 (Law. Co-op. 1981).) In order to recover under the Act, the railroad employee must show that he was injured as a proximate result of an accident which occurred in the course of his employment by the railroad and due to the railroad's negligence; however, the quantum of evidence necessary to establish liability is much less than in an ordinary negligence case. (*Duffield v. Marra, Inc.* (1988), 166 Ill. App. 3d 754, 759-60, 520 N.E.2d 938, 942.) Under the statute, the test of whether a jury case has been made is simply whether the proofs justify, with reason, the conclusion that employer negligence played any part, even the slightest, in producing the injury. (*Duffield*, 166 Ill. App. 3d at 760, 520 N.E.2d at 942.) Moreover, the Federal Act imposes upon an employer railroad a nondelegable duty to provide its employees with a safe place to work. *Duffield*, 166 Ill. App. 3d at 760, 520 N.E.2d at 942.

An issues instruction tells the jury what points are in controversy between the parties and thereby simplifies their task of applying the law to the facts. (Illinois Pattern Jury Instructions, Civil, No. 20.00, Introduction, at 20-4 (3d ed. 1991).) The issues instruction should inform the jury of the issues raised by the pleadings in a clear and concise manner, and this can be accomplished by a *summary* of the pleadings, succinctly stated without repetition and without undue emphasis. (*Signa v. Alluri* (1953), 351 Ill. App. 11, 19-20, 113 N.E.2d 475, 479.) It has been held that " 'explaining the ways in which [an] issue could be proven as part of the issues instruction gives undue emphasis to the plaintiff['s] theory.' " (*Robinson v. Greeley & Hansen* (1983), 114 Ill. App. 3d 720, 729, 449 N.E.2d 250, 257, quoting *Herbolsheimer v. Herbolsheimer* (1977), 46 Ill. App. 3d 563, 568, 361 N.E.2d 134, 138.) Moreover, the jury in the instant case was instructed, without objection, that the defendant railroad had a duty to use ordinary care to provide plaintiff with a reasonably safe place in which to do his work (plaintiff's instruction No. 25) and a duty to use ordinary care to provide plaintiff and its employees with reasonably safe and suitable tools, machinery, and appliances with which to do his and their work (plaintiff's instruction No. 24). We also note that the negligence allegations of the complaint specified that defendant failed to provide or maintain for plaintiff a reasonably safe place to work and failed to provide or maintain the working area and equipment necessary for the plaintiff to conduct his work in a reasonably safe manner. Although the trial court is empowered with the discretion to refuse to submit to the jury an issue instruction based on a theory not

supported by the record (*Ellis v. St. Louis Southwestern Ry. Co.* (1990), 193 Ill. App. 3d 357, 361, 549 N.E.2d 899, 901), we find based on the record sufficient evidence to submit these issues to the jury. We therefore find no abuse of the court's discretion in giving this part of plaintiff's instruction No. 15A because the jury was not misled by "general" allegations of negligence.

■ Defendant also claims impropriety in the second allegation of the issues instruction in that the evidence failed to show that the absence of an additional worker to act as a spotter was a proximate cause of plaintiff's accident. There was testimony, however, from plaintiff, Gatewood, and Dickerson that spotters were used to let the crane operator know where certain workers were, due to the operator's impaired visibility inside the cab, and to signal the operator when to move the boom. Moreover, Gatewood testified that following plaintiff's accident, defendant sent two additional men to the work site, and one of those men acted as a spotter, to watch the machine and the men unhooking ties and to give signals to the operator. Defendant contends that because Flowers testified that he was looking directly at plaintiff immediately before the accident, the need for the spotter was negated and there was nothing a spotter could have done to prevent the accident. However, plaintiff testified that he looked at Flowers before he got on the bundles and before Flowers had finished repositioning the cherry picker but that after he was on the bundles hooking the tie dogs, his back was to the cab of the crane. A trial court has discretion in deciding which issues are raised by the evidence. (*Ellis*, 193 Ill. App. 3d at 361, 549 N.E.2d at 901.) Moreover, plaintiff has the right to have the jury clearly and fairly instructed on each theory of his case that is supported by the evidence. (*Ervin v. Sears, Roebuck & Co.* (1976), 65 Ill. 2d 140, 145, 357 N.E.2d 500, 503.) We find no abuse of discretion in the circuit court's decision that an issue was presented to the jury by evidence in the record that failure to provide a "spotter" on the work site on the day of the accident was a proximate cause of plaintiff's injury. Therefore, the court properly gave that part of plaintiff's issues instruction concerning the theory that defendant negligently failed to provide sufficient personnel to enable plaintiff to conduct his work in a reasonably safe manner.

■ Defendant lastly argues that since there was no evidence of other causes besides the defendant's negligence, the giving of plaintiff's proximate cause instruction was error and allowed the jury to speculate as to other causes when none were involved. More specifically, defendant argues that the short-form proximate cause instruc-

tion tendered by it as defendant's instruction No. 3 should have been given, rather than the long-form proximate cause instruction plaintiff tendered and given as plaintiff's instruction No. 14, because the only possible cause of plaintiff's injury shown by the evidence was the alleged negligent acts or omissions of the defendant and its agents. Both of these instructions are versions of IPI Civil 3d No. 15.01, which reads as follows:

"When I use the expression 'proximate cause,' I mean [that] [a] [any] cause which, in natural or probable sequence, produced the injury complained of. [It need not be the only cause, nor the last or nearest cause. It is sufficient if it concurs with some other cause acting at the same time, which in combination with it, causes the injury.]"

Defendant's tendered instruction No. 3 read as follows:

"When I use the expression 'proximate cause' I mean that cause which, in natural or probable sequence, produced the injury complained of."

Plaintiff's instruction No. 14, which the court gave to the jury, added the last two bracketed sentences of IPI Civil 3d No. 15.01.

Some courts have held that where there is no evidence that a third party's negligence was involved in the injury to plaintiff, the long form of IPI Civil 3d No. 15.01 is inapplicable (*Bass v. Washington-Kinney Co.* (1983), 119 Ill. App. 3d 713, 722, 457 N.E.2d 85, 93), and that the additional language contained in the last two sentences of the instruction can be confusing. (*Willson v. Pepich* (1983), 119 Ill. App. 3d 552, 557, 456 N.E.2d 882, 886.) However, the supreme court in *Casey v. Baseden* (1986), 111 Ill. 2d 341, 490 N.E.2d 4, held that the long form was properly given in a case involving only one plaintiff and one defendant and the issue of plaintiff's comparative negligence, a situation not unlike the instant case. In *Casey*, a jury verdict was entered in favor of plaintiff and the jury apportioned plaintiff's comparative negligence at 30% and reduced its verdict accordingly. On appeal, the defendant in *Casey* argued that the long-form proximate cause instruction should not have been given when only one plaintiff and one defendant were involved, because the instruction could have confused and misled the jury into believing that third parties contributed to the negligence and this may have affected the verdict. The court rejected this argument, stating:

"While it is possible that the long form of the instruction could, in remote circumstances, prove confusing to a jury when only two parties are involved in an accident, we do not think this is such a case. Other instructions did not allude to the pos-

sible acts of third parties; they clearly instructed the jury on how to apportion damages if it found that both parties were negligent and advised the jurors to calculate the comparative negligence of the parties assuming that '100% represents [their] total combined negligence.' Viewed in their entirety, the instructions fully and fairly apprised the jury of the relevant principles [citation] relating to treatment of the plaintiff's fault." *Casey*, 111 Ill. 2d at 348-49, 490 N.E.2d at 7.

■■ We note in the instant case that plaintiff's instruction No. 32, Illinois Pattern Jury Instructions, Civil, No. 45.05 (3d ed. 1991), was given to the jury without objection of defendant. This instruction, like the instruction given in the *Casey* case, advised the jury to calculate the comparative negligence of the plaintiff and defendant. However, the instruction in the instant case also charged the jury to calculate the comparative negligence of all other persons whose negligence proximately contributed to the plaintiff's injuries, assuming that 100% represented the total combined negligence, and then to reduce the total amount of plaintiff's damages by the proportion or percentage of negligence attributable solely to the plaintiff.

As noted in the drafting committee's comments to the third edition of IPI Civil No. 15.01, recent decisions have demonstrated a reluctance, similar to that in the *Casey* case, to hold that the long form of the instruction prejudiced a party. The committee further concluded that it will rarely be error to give the long form of the instruction, and the short form may now be restricted to those cases where the evidence shows that the sole cause of the plaintiff's injury (other than plaintiff's predisposition) was the conduct of a single defendant and there is no evidence that the plaintiff's conduct was a contributing cause.

Committee commentary on use of this pattern instruction in the second edition of Illinois Pattern Jury Instructions provided that the instruction in its entirety, including the last two sentences, should be used *only* when there is evidence of a concurring or contributing cause to the injury, other than acts or omissions of the plaintiff. In comparison, the Notes on Use for this instruction in the third edition of IPI provide that in cases where there is no evidence that the conduct of any person other than a single defendant was a concurring or contributing cause, the short version without the bracketed material *may* be used. Therefore, use of the long form seems to be preferred, considering adoption of comparative negligence, with suggested use of the short form being discretionary, rather than mandatory, in situations where there is only one plaintiff and one defendant.

Moreover, although the jury assessed 0% as plaintiff's comparative negligence in count I, the mere fact that the court gave, without objection, plaintiff's instruction as to the calculation of comparative negligence indicates to this court that there was evidence in the record that plaintiff's conduct could have been a contributing cause to his injury. Therefore, because the issue of plaintiff's comparative negligence would go to the jury, the court did not err in finding that the long form rather than the short form should be used, given the Committee Comments in the third edition of Illinois Pattern Jury Instructions Civil No. 15.01.

■■ We will next address the issue of whether the jury properly awarded damages based on the impairment of plaintiff's future earning capacity. Defendant contends that the only evidence presented on the measure of damages for plaintiff's impairment of earning capacity was that he now earns $8 per hour and that he earned $12 per hour as a laborer for defendant railroad. Defendant contends that there was no medical testimony that plaintiff was unable to do the physical labor required on a railroad. Defendant concludes that it was pure speculation by the jury whether or not another railroad would hire plaintiff knowing of his past medical history.

Plaintiff testified, however, that in his job search in Kansas City following his dismissal in 1983, he mentioned the 1979 back injury in the job applications but was turned down for numerous jobs. He testified that he was accepted for employment at various jobs in California when he omitted information about the prior back injury. He also testified that it was necessary for him to leave a number of jobs he had obtained because of the pain. Plaintiff testified that he now and in the past has throbbing continuous pain in his lower to middle back on his right side and that he will get sharp pain followed by numbness in his left leg and left arm on occasion. Finally, plaintiff testified that had he not been discharged in 1984, he would not have been able to continue to work for defendant with his back condition, and the injury had changed the type of work that he was able to do. Dr. Bolton also testified that plaintiff's injury left permanent scar tissue, that plaintiff would always be plagued with intermittent pain, and that in his opinion it would be up to the individual employer whether they should hire an applicant such as plaintiff with a history of prior back injury.

Testimony by plaintiff that his injuries diminished his capacity to work, the appearance of plaintiff on the witness stand, and testimony as to the nature of his injuries and their duration are sufficient to take the question of impaired earning capacity to the jury. (*Shaheed v. Chicago Transit Authority* (1985), 137 Ill. App. 3d 352, 360, 484

N.E.2d 542, 549.) Furthermore, a physician may testify as to whether an injury is permanent, and once plaintiff introduces evidence of permanent injury, the jury should be instructed as to loss of future earnings. (*Gray v. Hallett* (1988), 170 Ill. App. 3d 660, 667, 525 N.E.2d 89, 94.) Evidence in the record that plaintiff's injury was permanent and prevented plaintiff from continuing his employment provides sufficient evidence for a jury to arrive at a calculation for lost future wages without undue danger of speculation or conjecture. (*Shaheed*, 137 Ill. App. 3d at 360-61, 484 N.E.2d at 549.) We find that the question of plaintiff's loss of future earning capacity was properly before the jury and that its award was not a result of speculation or conjecture.

Finally, we will address the issue of whether comments made by plaintiff's counsel during closing argument resulted in a verdict based on passion and prejudice, preventing defendant from receiving a fair trial. Defendant first contends that plaintiff's counsel made the following personal-opinion and adverse-characterization comments concerning Dr. Rosenbaum, defendant's medical expert witness, which were unsupported by the record and which diverted the jury's attention from a trial of plaintiff's case to a trial of defendant's witness:

(1) Comments that counsel was personally "incensed," "antagonized," and "insulted" that Dr. Rosenbaum was hired to come in and find nothing wrong with plaintiff in order to "beat out people like [plaintiff] out of the money they are entitled to" and that "if the jury was not [also] incensed they were not the people he thought he picked for the jury."

(2) Comments characterizing Dr. Rosenbaum as a "greased pig" that he had been "trying to catch for a long time" and that "Dr. Rosenbaum spends the biggest part of his professional career trying to beat people like [plaintiff] out of what they got coming. Does that affect you in this case? Does that affect the way this case was handled?"

(3) The comment, "[t]he only way you can keep this jury system strong, that you are privileged to be a part of, is to not let people like the railroad, and people like Dr. Rosenbaum get away with the things that have been happening in this courtroom while you have been here. You have got to stand up and be counted. Stand up and be counted. And I challenge you to do this on the things that have been happening." (No objection.)

(4) The comment, "I would ask you to set the conscience of this community and say to the Railroad [objection sustained]

and you say to the Railroad, we want to be dealt with honestly. [Objection overruled.] We don't want to be fiddled with. We don't want games played with us, and we are going to award the full amount of damages in this case."

Defendant further contends that counsel argued facts within his own knowledge and not within any of the testimony:

(1) That defendant railroad had the supervisor of litigation in the courtroom. (An objection was sustained.)

(2) That the railroad had people that work on these cases within the railroad. (An objection was overruled.)

(3) That defense counsel was a "very, very experienced defense lawyer" whose firm is very big. (No objection.)

Defendant also contends that plaintiff's counsel made the following inflammatory comments during closing argument:

(1) The comment defense counsel had made fun of plaintiff's slowness and his speech yet plaintiff's counsel also sought undue sympathy from the jury by stating that his client was not an "Einstein" and could not speak well. (No objection.)

(2) The comment made in arguing against the defense of physical impossibility, "Now what do you believe? My dad always says, maybe you have heard it, 'Figures don't lie, but liars can figure.' Isn't that right? Haven't we all heard that? Well, isn't that what happened here?" (No objection.)

Defendant contends that the cumulative effect of plaintiff's improper arguments was grossly prejudicial to defendant's right to a fair and impartial trial and that the jury's award for future medical care and treatment was therefore the result of passion and prejudice. Defendant contends that there was no evidence as to the type, frequency, or amount of medical treatment plaintiff would require and that the only evidence on the question of future medical expenses was the testimony of Dr. Bolton that plaintiff has needed treatment for almost four years and, in his opinion, plaintiff would need treatment in the future. Defendant argues that the $104,965.56 future portion of the jury's award for past and future medical expenses resulted from plaintiff's inflammatory closing argument, especially considering that proven special damages were only $10,034.44. Defendant seeks vacation of the judgment and remand for a new trial with instructions to plaintiff's counsel to refrain from making the inflammatory comments referred to above. In the alternative, defendant seeks a remittitur of the judgment to $10,034.44, representing a $104,965.56 reduction in the amount of the jury's award, because any award for future medical expenses was against the manifest weight of the evidence.

■■■ We shall address each of the alleged improper comments made during plaintiff's closing argument *seriatim*. Initially, we note that the standard of review of the argument complained of is whether the remarks were of such character as to have prevented defendant from receiving a fair trial. (*Trice v. Illinois Central Gulf R.R. Co.* (1984), 127 Ill. App. 3d 1019, 1022, 469 N.E.2d 344, 347.) Moreover, a motion for new trial is addressed to the discretion of the trial judge, and his judgment thereon will not be reversed except for a clear abuse of discretion which must affirmatively appear on the record. (*Chloupek v. Jordan* (1977), 49 Ill. App. 3d 809, 817, 364 N.E.2d 650, 656.) The law is also clear that broad latitude must be afforded counsel in closing argument. *American National Bank & Trust Co. v. Thompson* (1987), 158 Ill. App. 3d 478, 487, 511 N.E.2d 1206, 1212.

■■■ With regard to defendant's contention that plaintiff's closing argument was replete with inflammatory personal opinions, plaintiff points out that the record shows that in almost every instance, defendant made no objection or the court sustained defendant's objection. Generally, failure to object to comments made during closing argument is considered a waiver of the objection (*Chloupek*, 49 Ill. App. 3d at 817, 364 N.E.2d at 656), and alleged error in closing arguments to the jury will not be considered on appeal in the absence of a ruling by the trial court as to the propriety of the argument. (*Hunter v. Sukkar* (1982), 111 Ill. App. 3d 169, 173, 443 N.E.2d 774, 777.) However, if unobjected-to remarks are so inflammatory and prejudicial to the extent that the parties litigant cannot receive a fair trial and the judicial process cannot stand without deterioration, then upon review this court may consider such assignments of error although no objection was made and no ruling made or preserved thereon. (*Hunter*, 111 Ill. App. 3d at 174, 443 N.E.2d at 777.) We find that in the context of the argument presented, the unobjected-to comments concerning defense counsel and his firm, that plaintiff "wasn't an Einstein," and the folk wisdom concerning the defense of physical impossibility were not so inflammatory or prejudicial as to affect defendant's right to a fair trial, and so we will not consider this alleged error. However, because some of the remaining unobjected-to comments could have impacted on the jury's award, we will consider their alleged impropriety.

Defendant did not object when plaintiff's counsel, in referring to the almost identical examination reports prepared by Dr. Rosenbaum as a defense expert in other cases, stated:

"And, if you are not *insensed* [*sic*] as I was, as you could tell what I did and how I felt, if you are not insensed, [*sic*] *then*

*you are not the people I think I picked for this jury."* (Emphasis added.)

Defendant also did not object to the following portion of plaintiff's rebuttal argument, except for the last statement thereof:

"And then they do the epitome. I just wanted to show you, I don't know whether this *antagonizes* you as it does me, or if it *insults* you as it does me, but the technique, the way they defended this case, \*\*\* was they bring in this Rosenbaum, this doctor.

On the farm, we used to have sometimes a picnic and fairs. We had greased pig contests. Maybe none of you have ever been to one. But, I will tell you, a pig is a hard thing to catch anyway, but a greased pig is really hard. And I have been trying to catch this *greased pig* for a long time. You could tell that by the cross[-]examination. And I caught him. I finally caught him. And I am so proud that we caught him in this case.

What they do, and you can see what they do, they hire him to find nothing wrong, and that is exactly what he does. He comes high, but he does exactly why they hire him. You can see why we send a nurse there because you heard from her that all the stuff he obviously, when you read this, he has on a computer, he doesn't even do \*\*\* a lot of the tests that he claims he does.

And what they do is, they hire a guy like that. Does that affect your judgment on the way they are treating one of their former employees and their defense in this case? Does it *insense* [*sic*] you as it does me?" (Emphasis added.)

Defendant objected to the last statement, contending that the argument had nothing to do with the issues of the case, but the court overruled the objection as final argument.

Defendant compares the closing argument remarks of plaintiff's counsel comparing Dr. Rosenbaum to a "greased pig" to the remarks of counsel in *Regan v. Vizza* (1978), 65 Ill. App. 3d 50, 382 N.E.2d 409, wherein it was found to be reversible error to liken a plaintiff's medical witness to the television character "Paladin," who was a "hired gun" in the Old West. Illinois courts have taken a dim view of impugning the integrity of physicians testifying as expert witnesses. (*Hunter*, 111 Ill. App. 3d at 173, 443 N.E.2d at 777.) Defendant also notes that expressions of counsel's personal opinion of opposing witnesses which are unsupported by the evidence in the record constitute error, citing *Kerns v. Lenox Machine Co.* (1979), 74 Ill. App. 3d 194, 392 N.E.2d 688. It is fundamentally improper to make attacks unjusti-

fied by the evidence on parties or witnesses. (See *Wilson Brothers v. Haege* (1931), 347 Ill. 140, 179 N.E. 459.) Moreover, it is improper in closing argument to impugn the honesty of the opposing attorney and witnesses and to ascribe bad motives to the opposing party. (*Hubbard v. McDonough Power Equipment, Inc.* (1980), 83 Ill. App. 3d 272, 283, 404 N.E.2d 311, 320.) However, it is not improper to comment on the credibility or judgment of a witness or party where the remarks are based on facts appearing in the evidence. *Regan*, 65 Ill. App. 3d at 53, 382 N.E.2d at 411; *Chavez v. Watts* (1987), 161 Ill. App. 3d 664, 669-70, 515 N.E.2d 146, 150.

We find that the comments here were more in the nature of questioning Dr. Rosenbaum's credibility rather than insult or abuse of a witness upon no legitimate ground in the evidence. In *Regan*, where defendant's counsel compared plaintiff's medical expert to a "hired gun," the testimony showed that this witness was a specialist physician who worked at the hospital where plaintiff sought medical attention and was referred not by plaintiff's attorney but by the emergency room physician who first treated the plaintiff. (*Regan*, 65 Ill. App. 3d at 54, 382 N.E.2d 411.) In *Kerns*, the defense counsel had characterized plaintiff's expert witness as a "Monday Morning Quarterback" and stated that he personally resented people such as the expert without any evidence to support the characterization or opinion to be found in the record. (*Kerns*, 74 Ill. App. 3d at 198, 392 N.E.2d at 691.) In the instant case, however, plaintiff introduced numerous exhibits of previous medical reports prepared by Dr. Rosenbaum for defense counsel, which counsel asserted had strikingly similar language and the conclusion that there was nothing medically wrong with the party. Moreover, counsel had attacked Dr. Rosenbaum's credibility by way of Mary Schulte's testimony that Dr. Rosenbaum had not performed certain tests on plaintiff that his report for the defense had indicated that he had performed. While the analogy to the "greased pig" may be considered insulting and thus overstepping the boundaries of propriety, we note that no objection was made by defendant to this portion of plaintiff's rebuttal argument until plaintiff's counsel had completed conveyance of the message. We therefore find it difficult to agree that the remarks were so inflammatory and prejudicial as to have denied defendant a fair trial.

Moreover, plaintiff argues that comments attacking the credibility of Dr. Rosenbaum and his diagnosis finding nothing medically wrong with plaintiff were justified as a fair response to defendant's attacks in its closing argument on the diagnosis and prognosis of plaintiff's injuries made by plaintiff's treating physicians. The jury determines

credibility of witnesses and the weight to be given their testimony. (*Elliott v. Koch* (1990), 200 Ill. App. 3d 1, 12, 558 N.E.2d 493, 501.) There was gross discrepancy between the opinions of the medical experts in this case. Dr. Rosenbaum found no objective evidence that plaintiff suffered any disorder of the brain, spinal cord, or central or peripheral nervous systems. Dr. Bolton, on the other hand, found objective evidence of muscle spasm, and thoracic vertebral strain syndrome, with scoliosis and loss of the normal lordotic curve. We find that the comments made in rebuttal inviting the jury to consider the similar physical evaluations prepared for the defense by Dr. Rosenbaum, when it assessed the credibility of and judgment of defendant's expert witness, were grounded in the evidence and therefore proper argument. We also find that the remaining unobjected-to comments, that the jury should "stand up and be counted" and "not to let the railroad and Dr. Rosenbaum get away with things that have been happening," to be fair response on rebuttal to defendant's argument in support of its defense of physical impossibility and of plaintiff's credibility with regard to his alleged injury. Therefore, these comments were also based on the evidence and not so prejudicial as to have denied defendant a fair trial. Moreover, we find that the statements, "we want to be dealt with honestly," "without being fiddled with," or "having games played with us," were fair comment on Dr. Rosenbaum's credibility as a defense expert, based upon the evidence, and therefore the court did not abuse its discretion in ruling that they were not improper closing argument.

We agree with defendant that it is improper for counsel to argue to the jury facts in his own knowledge which had not been testified to by any witness. (*Bulleri v. Chicago Transit Authority* (1963), 41 Ill. App. 2d 95, 104, 190 N.E.2d 476, 481.) However, the court sustained defendant's objection to the comment about the supervisor of litigation. This corrective action taken by the court, in our opinion, rendered harmless, in the context of the whole trial, any error arising as a result of this statement. (*Funk v. Venture Stores, Inc.* (1981), 94 Ill. App. 3d 115, 121, 418 N.E.2d 498, 503.) Defendant also complains, however, that plaintiff then proceeded to comment on the railroad having people to work on these cases to take statements and that its objection to this commentary was overruled by the court. We find that in the context of the argument, plaintiff was making a fair response to defendant's argument for the physical impossibility defense and the absence of any photographic evidence of the crane. Plaintiff also points out that Hoover Gatewood and Mike Flowers both testified that they gave statements to the railroad in 1980 concerning plain-

tiff's accident, the obvious inference being that the railroad has people who work on these cases. We therefore find no abuse of discretion in overruling defendant's objection to this argument.

Finally, as to comments regarding the jury being the conscience of the community, where plaintiff is not entitled to exemplary damages it is improper to argue that a large verdict should be rendered as a deterrent to other wrongdoers. (*Chicago Union Traction Co. v. Lauth* (1905), 216 Ill. 176, 74 N.E. 738.) Again we note that the court sustained defendant's objection to this comment and that plaintiff did not pursue this line of argument following the court's ruling. However, though an objection be sustained, the error is not removed if it reasonably appears that the improper argument has influenced the verdict. *People v. Gary* (1963), 27 Ill. 2d 362, 189 N.E.2d 287.

Damages are peculiarly an issue of fact for a jury to determine and are subject to reversal when excessive, that is, a reviewing court will not disturb a jury's award of damages unless obviously the result of passion or prejudice. (*Chambers v. Rush-Presbyterian-St. Luke's Medical Center* (1987), 155 Ill. App. 3d 458, 467-68, 508 N.E.2d 426, 432.) An award is not excessive unless it falls outside the necessary limits of fair and reasonable compensation or shocks the judicial conscience. (*Chambers,* 155 Ill. App. 3d at 468, 508 N.E.2d at 432.) A jury's award will not be subject to remittitur where it falls within the flexible range of conclusions which can reasonably be supported by the facts. (*Chambers,* 155 Ill. App. 3d at 468, 508 N.E.2d at 432.) If a jury is properly instructed and has a reasonable basis for its award, a reviewing court will not disturb its verdict. *Thompson,* 158 Ill. App. 3d at 488, 511 N.E.2d at 1212.

Plaintiff's counsel suggested $300,000 as reasonable damages to award plaintiff for the injuries alleged in count I of the complaint, and the jury awarded $175,000. Out of this award the jury assessed $115,000 for past and future medical expenses, thus the $104,965.56 portion representing future medical expenses was approximately 10 times the amount of plaintiff's proven special damages of $10,034.44. Although defendant argues that this proves that the verdict was a result of passion and prejudice, the record indicates that plaintiff was 35 years old at the time of trial and had a remaining life expectancy of 34.1 years. Plaintiff also testified that he did not seek any medical care after 1984 because he could not pay the bills, so the jury could reasonably have assumed that plaintiff's past medical expenses could have been much higher and accordingly projected future medical expenses in an amount 10 times higher than the special damages. Moreover, Dr. Bolton testified that plaintiff's injury was perma-

nent and that he would have intermittent pain in the future. Thus, the jury could reasonably have found that for the rest of plaintiff's life he would quite assuredly need access to some continuing medical care for his injury and that nearly $105,000 approximated the cost of that care over the next 34 years. We conclude, therefore, that the verdict does not fall outside the limits of fair and reasonable compensation, that there is no indication that it resulted from passion or prejudice, and that it is not so large as to shock the judicial conscience under the facts of this case.

Accordingly, the May 18, 1989, judgment of the circuit court of St. Clair County is affirmed.

Affirmed.

HARRISON, J., concurs.

PRESIDING JUSTICE RARICK, dissenting:

I write this dissent because I believe numerous comments made by plaintiff's counsel during closing argument, particularly on rebuttal, taken as a whole prevented defendant from receiving a fair trial. Specifically, I find fault with counsel's adverse characterizations of Dr. Rosenbaum in connection with counsel's inflammatory personal opinions which served only to arouse the prejudice and passions of the jury. Such comments went far beyond the mere questioning of the judgment and credibility of witnesses. (See *Kerns v. Lenox Machine Co.* (1979), 74 Ill. App. 3d 194, 198, 392 N.E.2d 688, 691; *Regan v. Vizza* (1978), 65 Ill. App. 3d 50, 53-54, 382 N.E.2d 409, 411-12; see also *Green v. Cook County Hospital* (1987), 156 Ill. App. 3d 826, 830-31, 510 N.E.2d 3, 5-6.) Counsel also improperly referred to the jury as the conscience of the community although exemplary damages were not even in issue. Such language urged the jury to decide the case, not on the law and evidence, but in a "punitive manner." (See *Department of Conservation v. Strassheim* (1981), 92 Ill. App. 3d 689, 695, 415 N.E.2d 1346, 1352.) And lastly, counsel's comments pertaining to the size of defense counsel's firm and its expertise were all irrelevant to the issues at hand serving only to cause additional prejudice. (See *Brown v. Arco Petroleum Products Co.* (1989), 195 Ill. App. 3d 563, 565-66, 552 N.E.2d 1003, 1006.) I by no means wish to dampen or curtail zealous advocacy, but even zealous advocacy must fall within reasonable bounds of propriety. In my view, plaintiff's counsel overstepped that boundary in this instance.

I further disagree with the majority with respect to the issue of discovery sanctions for failing to produce a copy of the notes Mary Schulte made during plaintiff's medical examination. Regardless of whether the withholding of the notes was intentional or not, the fact of the matter is that the notes were not disclosed in discovery. I believe Schulte should not have been allowed to testify from these notes. To hold otherwise countenances violation of discovery rules. (See *Ferenbach v. DeSyllas* (1977), 45 Ill. App. 3d 599, 602-03, 359 N.E.2d 1214, 1217.) For these reasons, I respectfully dissent.