TIMOTHY ATWOOD, a Minor, by his Mother and Next Friend, Alberta Atwood, Plaintiff-Appellee, v. CHICAGO TRANSIT AUTHORITY, Defendant-Appellant.

First District (2nd Division)   No. 1—91—3858

Opinion filed August 3, 1993.—Modified on denial of rehearing October 12, 1993.

Hoffman, Burke & Bozick, of Chicago (Edmund J. Burke, of counsel), for appellant.

David A. Novoselsky & Associates, of Chicago (David A. Novoselsky and Linda A. Bryceland, of counsel), for appellee.

JUSTICE DiVITO delivered the opinion of the court:

On March 23, 1983, at approximately 8:25 a.m., James Cockrell was the motorman of a Chicago Transit Authority (CTA) train that was leaving eastbound from the Kildare station. That station is 15 or 20 feet west of Kildare between two sets of tracks (eastbound and westbound), which are at grade level. One set of gates blocks automobiles on Kildare, a smaller pair stops pedestrian traffic at the two sidewalks. Just after the train left the station, it struck plaintiff Timothy Atwood, then nine years old, who was on his way to the train to go to school. Through his stepmother, plaintiff filed this personal injury suit against the CTA and the motorman (collectively, defendants), alleging among other things that the CTA was not only vicariously liable for his injuries under the doctrine of *respondeat superior* but also that the CTA was directly liable for willful and wanton entrustment in allowing the motorman to operate the train. The CTA moved for bifurcation of the entrustment count, but the circuit court denied the motion. Prior to the verdict, plaintiff voluntarily dismissed the motorman as a defendant. The jury found for the CTA on the entrustment count, but it awarded plaintiff $1 million on the negligence claim, reducing the award by 50% for plaintiff's own negligence. On appeal, the CTA raises four grounds for remanding for a new trial: the circuit court's decision not to bifurcate the trial; the court's refusal to give

an instruction at the close of the trial concerning certain evidence; the court's exclusion of the motorman's prior consistent statement; and improper closing arguments by plaintiff's counsel. We affirm.

Prior to the December 1990 trial, the parties presented motions *in limine*. Among these motions was defendants' request to postpone admission of all evidence concerning the motorman's driving record, which was relevant only to the entrustment claim, until plaintiff presented sufficient evidence of negligence, arguing that if plaintiff could not prove that the motorman had been negligent, then the CTA could not be faulted for entrusting him with the train. The court denied the motion, stating:

> "I don't think the plaintiff has to go in any particular order. Now, if it turns out that these prior instances of misconduct are not sufficient to arise [*sic*] to the standard of willful and wanton entrustment, then I think the jury should be given an instruction on that and told to disregard it and I could enter a directed verdict on that particular count."

Defendants also moved a few days later, still prior to *voir dire*, to bifurcate the trial on the entrustment count, in part on the same ground as their motion *in limine* and in part because many exhibits and much testimony would be rendered unnecessary if the jury found that the motorman was not negligent. The court denied this motion as well but stated that it would instruct the jury that proof of his driving record could not be considered when deciding whether the motorman was negligent. The court observed that admitting the evidence early in plaintiff's case in chief would make little difference, reasoning that if defendants became entitled to a directed verdict on the negligence claim, the trial would end, but if they were not, the evidence would come in anyway for the entrustment claim.

Defendants brought this matter up a third time. The court again refused to order plaintiff to refrain from presenting the motorman's previous driving record until he had produced sufficient evidence of negligence to survive a directed verdict motion, but it reiterated that it would instruct the jury to ignore the motorman's driving record when deciding whether he was negligent. When the question arose again during the trial, the court did not deny defense counsel's assertion that it had agreed to read the instruction both before the motorman's testimony and prior to deliberations. Nowhere in the record, however, did the court expressly state that it would give the instruction at the close of the evidence.

In his opening statement, plaintiff's counsel mentioned that other than plaintiff and the motorman, the only eyewitnesses to the acci-

dent were a man and a woman: Shocka Jackson and Sharon Jackson, who were not related. He told the jury that Mr. Jackson would testify that he was in the front window seat next to the motorman's cab, that he saw plaintiff run up to the train while waving for it to stop, and that the motorman waved back with one or both hands. Mr. Jackson, however, never was called as a witness.

Before the motorman began his testimony in plaintiff's case, the court cautioned the jury: "You are not to consider that evidence [about the motorman's driving record] as to whether or not [the motorman] negligently operated the train on this particular occasion, only that that evidence only goes to whether or not the CTA was willful and wanton in entrusting the train to him to be operated." The court then defined willful and wanton conduct.

The motorman had been employed by the CTA for over 24 years. He had been a motorman for 18 years, many of which had been spent driving on the rapid transit line involved here. As the driver, he sat in the cab of the car, which was on the right at the front of the train. The cab had one window in front and one on the right, but it had a blind spot about six inches wide in the right front corner. The motorman testified that on the morning in question, no one was standing near the cab to his left.

When the motorman pulled into the Kildare station, the barrier gates, which were five feet from the tracks, were down, lights were flashing, and bells were ringing.

The motorman stopped the train at the station for 15 or 20 seconds altogether. There was a steady green light, which told him the gates were down and he could proceed. About 10 seconds after the motorman stopped, he first saw plaintiff, who emerged from behind a garage on the southwest corner of the intersection. He also saw Sharon Jackson on the north side of the intersection. Plaintiff did not wave to him, and he did not wave to plaintiff. The boy briefly disappeared but then reappeared, running under the gates and in front of the train. The boy was heading northeast across the tracks, facing away from the train. The motorman had not seen the boy running after the train before it started moving because he was looking north, not south. The motorman immediately braked, but the train, which was traveling at about 5 or 10 miles per hour, did not stop until it had gone 5 or 10 feet and was almost across Kildare. The front left corner of the train hit the boy, whose leg became pinned under the train's left front wheel.

The motorman also was questioned about numerous incidents in his employment record from 1974 onward, e.g., showing a passenger

how to operate the train while he was driving it, speeding, and running a stop sign. None had resulted in an accident, and after each one he had been given training, a reprimand, or a suspension. When his attorney objected to admission of the motorman's driving record for lack of relevance to the accident, the court overruled the objection.

On plaintiff's direct examination of the motorman, attempts were made to impeach the motorman's testimony with excerpts from his deposition. Over plaintiff's objections, defense counsel elicited testimony from the motorman that he had made a written statement two or three hours after the accident, which he used to refresh his recollection prior to examination. Prior to any revelation of the statement's substance, plaintiff objected because (1) use of the statement was unfair surprise because it had not been disclosed during discovery after another judge ruled that it was privileged; and (2) it was a prior consistent statement and as such was inadmissible. Defendants countered that the statement was privileged until it was used to refresh the motorman's recollection and that it was admissible to rebut plaintiff's suggestion that the motorman's testimony was recently fabricated. After further argument, the court refused to admit the statement, finding that defendants could not withhold the statement for years and then try to have it admitted at trial. The court also refused to allow the motorman to be questioned about the contents of the statement. In an offer of proof, the motorman read the statement.

The conductor, Manuel Hernandez, testified as well, but he had been in the third car and had not seen the accident. Although at trial he was unable to remember the speed of the train, he had indicated in a statement just after the accident that the train had been traveling between one and five miles per hour. After the accident, he distributed cards so that witnesses could identify themselves and describe the accident; only five had been returned. Colleen Maurovich, coordinator of discovery compliance in the CTA's law department, explained that these cards had not reached the claim file on this case; she could not say why this had happened. Lamont Lee, the Chicago police officer who investigated the accident, also testified. When he arrived at the scene, plaintiff was still pinned under the train, which was east of the east sidewalk.

Other witnesses, including plaintiff, testified, but their testimony is not relevant to this appeal.

At the close of plaintiff's case, the circuit court granted defendants' motion for a directed verdict on the count for negligent design, but it denied their motions on the negligence count alleging normal standard of care and on the entrustment count. Initially, the court de-

ferred ruling on whether to direct a verdict on the negligence count with a higher standard of care, but it later granted the directed verdict on that count. Later, after the CTA had presented its case, it again moved for a directed verdict on the negligence count, but the court again denied the motion. In addition, the motorman was dismissed with prejudice.

Two witnesses testified for the CTA. Sharon Jackson, who lived just north of the Kildare station, witnessed the accident. When she approached the station, the gates were down, the lights were flashing, and the train was in the station. She was about 40 or 50 feet from the train and about two or three feet north of the north gates on the west side of Kildare. When she first saw plaintiff, he was about a quarter block south of the station, walking toward it. Then he stood opposite her, facing north, on the sidewalk behind the gate south of the tracks. After 10 or 12 seconds, during which the boy was standing still, the train began to move and the motorman was looking straight ahead. When the train reached the west sidewalk, she saw the boy "dart out across the tracks" around the gate. The train struck plaintiff at the east sidewalk, and it moved about five feet after hitting him. In her deposition, however, she had stated that she had not seen the boy move until she saw him running in front of the train when it passed the west sidewalk and reached the street and that the accident occurred in the middle of the street.

At the jury instruction conference, plaintiff asked that the CTA be barred from asserting that he could not procure Mr. Jackson's attendance, but the court did not rule on this request. The court did remark, however, "that's no problem" when defense counsel warned that he was "certainly going to comment on" plaintiff's not having presented Mr. Jackson as a witness despite having discoursed at length in his opening statement about Mr. Jackson's upcoming testimony. The CTA tendered a limiting instruction for use of the motorman's driving record, based on *Lockett v. Bi-State Transit Authority* (1983), 94 Ill. 2d 66, 445 N.E.2d 310, but the court rejected the instruction, declaring that the jury had already been instructed on this matter.

During closing argument, plaintiff's counsel acknowledged that he had not called Mr. Jackson to testify but explained that Mr. Jackson "couldn't really add a lot to the case." In response to the CTA's objection, plaintiff's counsel then remarked that the defense also had not called Mr. Jackson as a witness, commenting "[i]f [Jackson] would have helped [the CTA's] case, [the defense] would have called him." When defense counsel replied that he was unable to find Mr. Jackson,

plaintiff's counsel moved that the remark be stricken and the court did so.

As noted above, the jury returned a verdict of guilty on the negligence count and not guilty on entrustment. Damages of $1 million were reduced by half for plaintiff's own negligence. In its post-trial motion, the CTA raised a number of issues, including the ones we consider below. It asked for a judgment notwithstanding the verdict or, alternatively, a new trial. After a hearing, the court denied the motion.

I

The CTA argues first that denial of its motion to bifurcate the trial was reversible error given the highly prejudicial nature of the evidence of the motorman's prior driving record on the entrustment count. Noting that an entrustor cannot be liable in an entrustment action if the entrustee is not negligent and acknowledging that circuit courts have broad discretion to sever claims based on considerations of convenience and possible prejudice, the CTA contends that the circuit court should have bifurcated the trial here, as the court did in *Burlington Northern R.R. Co. v. J M C Transport, Inc.* (N.D. Ill. 1983), 567 F. Supp. 389. It claims that bifurcation would have promoted judicial economy because if the negligence count was tried first and it was found not liable, no trial on the other claim would have been necessary. Certainly, it claims, the motorman's driving record prejudiced the jury, citing *Lockett v. Bi-State Transit Authority* (1983), 94 Ill. 2d 66, 74, 445 N.E.2d 310, 314. The CTA further notes that the evidence is irrelevant, inadmissible, and highly prejudicial on the issue of negligence, and it claims that the prejudicial nature is reinforced by the verdict on the entrustment count. As for plaintiff's attempts to distinguish *Lockett* and *Burlington Northern*, the CTA counters, he "ignores the basic reasoning of" the former, which recognized that the circuit court must take affirmative action to remedy the prejudice that perforce follows admission of such evidence. As for waiver, it continues, its many objections before, during, and after trial belie the notion that it did not preserve the question, and the single limiting instruction was insufficient to stem the prejudicial tide. Lastly, in reply to plaintiff's argument that it conceded he presented sufficient evidence of negligence, it contends that it would be "completely illogical" to contend that the requisites of *Lockett* were met just because a "tainted verdict was entered on the negligence count."

A motion to sever is addressed to the circuit court's discretion, and the court's decision will be reversed only for abuse of that discre-

tion. (*Argueta v. Baltimore & Ohio Chicago Terminal R.R. Co.* (1991), 224 Ill. App. 3d 11, 28, 586 N.E.2d 386, 397 (not abuse of discretion to sever closing arguments and verdict on third party contribution claim), *appeal denied* (1992), 144 Ill. 2d 631, 591 N.E.2d 20.) We first note that not only is *Burlington Northern*, a Federal case, merely persuasive authority to an Illinois court, but more importantly, the judge in that case based his ruling on his discretion under the Federal Rules of Civil Procedure, not on his interpretation of Illinois law. That the entrustment claim was a counterclaim is yet another factor not present here.

We find the CTA's citation to *Neff v. Davenport Packing Co.* (1971), 131 Ill. App. 2d 791, 268 N.E.2d 574, similarly inapt. There, the court was asked whether a plaintiff could join a negligent entrustment claim with a negligence claim, and it held that this could not be done because when the defendant principal has admitted responsibility for an agent's negligence, negligent entrustment issues become irrelevant. As the supreme court explained in *Lockett*, however, *Neff*'s rationale does not apply when, as here, the entrustment alleged is willful and wanton. In *Lockett*, the circuit court had entered an *in limine* order excluding a driver's driving record altogether, purportedly following *Neff*. The supreme court held that it was impermissible to bar this evidence, which it described as "highly relevant, if not essential, to plaintiff's case [of willful and wanton entrustment], and to preclude its use was, in practical effect, to abolish plaintiff's cause of action." (*Lockett*, 94 Ill. 2d at 74.) The court then commented that an order excluding the driving record until the plaintiff had presented sufficient evidence of negligence to survive a directed verdict motion "would perhaps have been appropriate" and that a defendant "might well have been entitled to" a limiting instruction. *Lockett*, 94 Ill. 2d at 74.

■ Contrary to the CTA's argument, then, the holding in *Lockett* addressed solely the admissibility of the driver's record, though the court did observe in *dictum* that it might be preferable to postpone admission of such evidence and to give a limiting instruction. The court gave no views on the advisability of bifurcation. Furthermore, although severance often is advisable when a jury will become confused, the CTA has not explained why here the jury would have been any more confused than a jury may become whenever evidence may be used for a single, limited purpose, and would be prejudicial if used for other purposes, as here when the driving record could be considered for only one cause of action during a trial involving multiple counts. The CTA's argument assumes that limiting instructions are

routinely ignored, and, if adopted, would result in multiple trials each time evidence is admissible for only one count of a multiple-count complaint and has potential prejudicial effect on other claims.

## II

The CTA next contends that the circuit court's refusal, at the close of the trial, to give a limiting instruction about the evidence of the motorman's prior misconduct entitles it to a new trial. It points to three instances in which, it asserts, the court promised to give the instruction, such as when it stated that "if it turns out that these prior instances of misconduct are not sufficient to arise [sic] to the standard of willful and wanton entrustment, then the jury should be given an instruction on that and told to disregard it." The CTA also points out that the court agreed to instruct the jury as to the limited use of the evidence of the motorman's driving record, and it further claims that the circuit court agreed to give the instruction at the end of the case. Stressing that a party has the right to instructions on its theory of the case and that a court must instruct the jury with respect to all issues which it believes have been raised by the evidence presented, the CTA then claims, without citation, that if "a party can show that its right to a fair trial has been seriously prejudiced by the failure of the court to grant an instruction, then a new trial must be granted." The evidence here was not relevant, it continues, and so it therefore follows (without citation) that the court should have given the instruction because the instruction offered correctly stated the law. Furthermore, the CTA adds, unlike *Rios v. Navistar International Transportation Corp.* (1990), 200 Ill. App. 3d 526, 535, 558 N.E.2d 252, 259, *appeal denied* (1990), 133 Ill. 2d 572, 561 N.E.2d 707, here the use of a non-IPI (Illinois Pattern Jury Instruction) was proper because there is no pattern instruction that correctly limits the use of evidence of a train operator's prior misconduct to the willful and wanton entrustment count. Despite the instruction given just before the motorman testified, the CTA insists, the additional written instruction would have been more appropriate because the motorman was the second witness out of approximately 20 and his testimony occurred on the second day of trial. It quotes from plaintiff's closing argument to demonstrate the prejudice: "You [the jury] should decide what a man with those qualifications, whether he should be behind the wheel of a train. I think they tell us he's—I think the CTA is looking for a lawsuit here. This is an accident waiting to happen." The CTA closes by contending that the circuit court's rejection of the instruction, when

coupled with the court's refusal to bifurcate the trial and the improper closing, denied it a fair trial.

■■ We agree with the CTA that if prejudicial evidence that would tend to mislead the jury is admitted, the court should concisely advise the jury to consider it only for its limited purpose. (*Gaskin v. Goldwasser* (1988), 166 Ill. App. 3d 996, 1010, 520 N.E.2d 1085, 1093 (cumulative errors, including refusal of instruction regarding proper use of evidence of plaintiff's past conduct, warranted reversal), *appeal denied* (1988), 121 Ill. 2d 569, 526 N.E.2d 830.) Generally, however, a circuit court has discretion in giving instructions, and its refusal to do so must create undue prejudice to a party's right to a fair trial before a new trial will be ordered. (*Pharr v. Chicago Transit Authority* (1991), 220 Ill. App. 3d 509, 519, 581 N.E.2d 162, 168.) In this regard, the cases cited by the CTA are of little help to its cause.

For example, in *Wille v. Navistar International Transportation Corp.* (1991), 222 Ill. App. 3d 833, 584 N.E.2d 425, *appeal denied* (1992), 144 Ill. 2d 644, 591 N.E.2d 32, the court apparently never informed the jury that it had directed a verdict on assumption of risk, and it then repeatedly overruled the plaintiff's objections to the defendant's argument that the plaintiff's conduct had caused the accident. As a result, the jury was misled and believed that it could take the plaintiff's conduct into account. Here, by contrast, the jury was instructed as the CTA requested, though not as often as it wished. Unlike the party in *Wille*, moreover, plaintiff here did not capitalize on the court's refusal to give the instruction. Instead, plaintiff's counsel mentioned the driving record only during his argument on the entrustment count, as did the CTA's counsel. Furthermore, despite the CTA's insistence that the court agreed to give the limiting instruction again at the end of the trial, its counsel admitted on two occasions at the hearing on the post-trial motion that this purported promise does not appear anywhere in the record. Although we believe that it would have been preferable for the court to have given the proferred instruction at the end of the trial, given these circumstances and the discretionary nature of jury instructions, we see no reason to hold that the court's refusal to give the instruction a second time resulted in such prejudice that a new trial is warranted.

### III

The CTA contends next that this court must order a new trial because the circuit court should have allowed it to offer into evidence the motorman's written statement, which he made shortly after the accident, to counter plaintiff's insinuation that he altered his version

of the accident while on the witness stand. The CTA acknowledges that prior consistent statements generally are not admissible to corroborate a witness' testimony, but it points out that they may be admitted to rebut an inference that a witness' testimony is a recent fabrication. Here, it explains, plaintiff asked the motorman:

> "Now, sir, can you explain to the jury why before lunch you said you never saw the boy running to the right of your train but now you're telling us that the boy—you saw him—what was—I don't know if they were your counsel's words or yours— darted out from the right?"

The court then overruled the CTA's objection. In addition, a few seconds later, when counsel began his query with the words, "why did you tell us four hours ago," the CTA again objected and the court sustained the objection. Counsel also prefaced subsequent questions with phrases such as, "I understand that's what you're saying now" and "how come you're telling us now." Such comments implied, the CTA insists, that the motorman's version of the accident changed and thus mandated admission of his contemporaneous statement to rebut that implication. The CTA further denies that it invited error or took an inconsistent position with regard to whether the statement was protected by privilege in that the document remained privileged until the CTA was obliged to waive the privilege when plaintiff's counsel, not the CTA, raised the specter of recently fabricated testimony. It claims that it is of no consequence that it had the motorman explain his apparently inconsistent testimony because his explanations could not dispel the implication that the motorman fabricated his story at defense counsel's suggestion. The circuit court's refusal to admit the statement, in the CTA's view, was an abuse of discretion that can be rectified only by ordering a new trial.

As the CTA correctly asserts, prior consistent statements generally may not be admitted merely to corroborate a witness on direct examination, but they are admissible to rebut the inference that the witness' testimony is recently fabricated, that is, to demonstrate that the witness told a similar version of the facts before the alleged fabrication. (*People v. Williams* (1991), 147 Ill. 2d 173, 227, 588 N.E.2d 983, 1003, *cert. denied* (1992), 506 U.S. 876, 121 L. Ed. 2d 156, 113 S. Ct. 218.) A circuit court's decision on what evidence to admit and what to exclude, however, is within its discretion.

Here, the circuit court decided not to admit the statement for three reasons: (1) the proffered statement did not necessarily rehabilitate the motorman; (2) the motorman simply had been impeached generally, so the statement was not admissible; and (3) it would be "es-

sentially unfair" for the CTA to assert privilege for six years and then try to get the statement into evidence after plaintiff had completed his questioning. It is true that the jury here could have inferred from plaintiff's questioning that the motorman altered his testimony between his morning and afternoon appearances in court and that the statement would have rebutted this insinuation. Nevertheless, we believe that the possibility of prejudice was averted by the motorman's explanation that any apparent inconsistencies in his testimony were the result of his confusion while being questioned by plaintiff's counsel.

## IV

The CTA's final challenge to the fairness of the trial is the impropriety of plaintiff's statement in his closing argument that Mr. Jackson did not testify at trial because he would not add much to the case and could not be found, in light of plaintiff's assertion in his opening statements that Mr. Jackson would testify that plaintiff had run up to the train waving at it and that the motorman had waved back. Noting that closing arguments are limited to matters admitted, uncontroverted, or in evidence, the CTA continues, this explanation was improper given that Mr. Jackson was not called and his absence was not explained at trial. Although the CTA concedes that the statements were stricken,[1] it nevertheless complains that the circuit court's response "could not possibly erase from the minds of the jury the prejudicial nature of the statement made by plaintiff's attorney." Citing no support, the CTA further contends that the comment was highly prejudicial "because it was not a fair comment on the evidence" and there was no evidence that Mr. Jackson could add nothing or that he could not be found. In his opening, the CTA continues, plaintiff had outlined at "great length" Mr. Jackson's expected testimony, which would have been "highly favorable" to plaintiff's case. Thus, the CTA reasons, the comment that Mr. Jackson was unable to add much to plaintiff's case "implie[d] that Mr. Jackson would have provided favorable testimony had plaintiff needed him." Even if plaintiff's argument was stricken, the CTA concludes, the damage had been done because the jury heard the remark.

▪ Most of the cases the CTA cites in support concern one party's remarks on the absence of the other party's promised witness,

---

[1] As indicated in our summary of the trial, our reading of the record leaves considerable doubt as to the subject of the CTA's objection and as to which motion the court granted.

whereas here plaintiff's counsel himself commented on his own inability to produce a promised witness. The only case similar to the events here is *Williams v. Matlin* (1946), 328 Ill. App. 645, 66 N.E.2d 719, in which the plaintiff's counsel explained that the plaintiff's doctor had not testified because the doctor was away in the armed services. The appellate court said that this explanation was not error because if the plaintiff had not explained the doctor's absence, the defendant would have capitalized on the lack of explanation. Under *Williams*, then, it was not error for plaintiff to explain that Mr. Jackson could not be found, especially given that the court had not ruled on his motion to bar the CTA from commenting on his inability to procure Mr. Jackson's attendance.

As for the comment that Mr. Jackson would not have added anything to plaintiff's case, sustaining an objection to a comment about facts not in evidence may render an error harmless given the context of an entire trial. (*Lewis v. Cotton Belt Route—St. Louis Southwestern Ry. Co.* (1991), 217 Ill. App. 3d 94, 122, 576 N.E.2d 918, 939 (comment that head of litigation for defendant was in courtroom), *appeal denied* (1991), 142 Ill. 2d 655, 584 N.E.2d 130.) If, moreover, a court during closing argument sustains an objection to a comment about not producing a witness, admonishes the jury that argument is not evidence, and does not give the instruction that a jury may infer the worst, the error may be deemed cured, particularly when the complaining party did not tender an instruction concerning the inference to be drawn from a party's failure to produce a promised witness. *Hunter v. Chicago & Northwestern Transportation Co.* (1990), 200 Ill. App. 3d 458, 470, 558 N.E.2d 216, 224 (comment concerning failure to produce deceased witness' testimony was error but trial court corrected it).

Here, then, even if the comment was error, it was harmless in the context of the entire trial given how fleeting the remark was and the sustaining of the objection (*Lewis*, 217 Ill. App. 3d 94, 576 N.E.2d 918), or it may be said to have been cured because the court sustained the objection, instructed the jury that arguments were not evidence, and no instruction on inference was tendered (*Hunter*, 200 Ill. App. 3d 458, 558 N.E.2d 216).[2] We stress that the CTA never sought remedial action from the circuit court for plaintiff's inability to produce ev-

---

[2]The CTA argues in its petition for rehearing that jury instructions had been tendered prior to closing arguments. We do not require that parties exhibit clairvoyance as to the content of closing arguments, but the CTA does not explain why it did not move for a mistrial or at least offer an instruction when these circumstances arose.

idence in support of his opening statement remarks about Mr. Jackson's observations. The CTA's objection at trial, and the sole issue presented and addressed in this appeal on this matter, concerns the propriety of plaintiff's counsel's remarks that Mr. Jackson was not produced and that his testimony would not have added a lot to his case.

For the reasons stated above, we affirm the judgment of the circuit court.

Affirmed.

HARTMAN and SCARIANO, JJ., concur.